**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JAMES M. HARRISON,
              *Petitioner-Appellant,*

v.

DOUGLAS GILLESPIE,
              *Respondent-Appellee.*

No. 08-16602

D.C. No.
2:08-cv-00802-RCJ

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the District of Nevada
Robert Clive Jones, District Judge, Presiding

Argued and Submitted
September 23, 2010—San Francisco, California

Filed February 15, 2011
Amended May 10, 2011

Before: Alex Kozinski, Chief Judge, Stephen Reinhardt,
Sidney R. Thomas, Susan P. Graber, M. Margaret McKeown,
Kim McLane Wardlaw, William A. Fletcher,
Raymond C. Fisher, Marsha S. Berzon, Richard R. Clifton,
and Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.;
Dissent by Judge Thomas;
Dissent by Judge Reinhardt

## COUNSEL

David M. Schieck, Clark County Special Public Defender, Las Vegas, Nevada; JoNell Thomas (argued) and Scott Bindrup, Deputy Special Public Defenders, Las Vegas, Nevada; Bret O. Whipple, Las Vegas, Nevada, for the petitioner-appellant.

Steven S. Owens (argued) and David Roger, Office of the Clark County District Attorney, Las Vegas, Nevada; Catherine Cortez Masto, Nevada Attorney General, Carson City, Nevada, for the respondent-appellee.

## ORDER

Appellant's request for judicial notice of documents filed in the state trial court is granted.

Chief Judge Kozinski, and Judges Graber, McKeown, Wardlaw, Clifton, and M. Smith voted to deny Appellant's

petition for rehearing by the en banc court. Judges Reinhardt, Thomas, W. Fletcher, Fisher, and Berzon voted to grant the petition. The petition is denied. No further petitions for rehearing may be filed.

The majority opinion, and the dissenting opinion by Judge Reinhardt, filed on February 15, 2011, are amended to appear as filed concurrently with this Order. Judge Thomas's dissent is unchanged from the original filed on February 15, 2011, and Chief Judge Kozinski's concurrence filed on the same date is withdrawn.

## OPINION

M. SMITH, Circuit Judge:

Petitioner James Harrison was convicted of first-degree murder in the guilt phase of his trial, but the jury deadlocked over his sentence in the penalty phase of his case. Harrison requested that the jury be polled to ascertain whether the jury had ruled out the death penalty, and was deadlocked on a lesser sentence. The trial court denied Harrison's request and, after determining that further deliberations would not help the jury arrive at a verdict, discharged the jury. Harrison filed a petition for a writ of habeas corpus seeking to prevent the State of Nevada from seeking the death penalty in the pending retrial of penalty-phase proceedings.

Harrison contends that the trial court violated his constitutional right to be free from double jeopardy because the trial court failed to ask the jury if it had unanimously rejected the death penalty, and instead was deadlocked over a lesser sentence, before discharging the jury. We hold that under the facts of this case, the trial judge did not abuse her discretion, or subject Harrison to double jeopardy, by declining to poll the jury before discharging it because it was deadlocked, and unable to reach a verdict.

## FACTUAL AND PROCEDURAL BACKGROUND

Harrison was convicted of first-degree murder on November 21, 2006. The State sought the death penalty during the penalty phase of the proceedings, but the jury eventually advised the trial judge that it was deadlocked over Harrison's sentence.

In mid-afternoon, November 27, 2006, the trial judge noted:

> [W]e had two notes from two different jurors indicating that the jury was deadlocked between life with and life without.[1] We went over those in chambers . . . . [T]hey indicated they were deadlocked . . . when they were last here. We brought them back today. They've been deliberating all day. The Court's inclination is to bring them back and just question them as to whether or not it would be fruitful to continue in any deliberations. They have been working all day, and if they indicate not, then the Court's going to go ahead and excuse them.

The court then clarified that it had received the two notes "before the lunch break," and that the court, in response, had told the jury to "just keep going" through lunch. After lunch, the court's bailiff "asked them again . . . if they wanted to keep deliberating. They indicated no."

Harrison's counsel objected to the court's proposed course of action:

> I'd request that we inquire from the jurors how far along in the process that they were in this penalty phase, and by that I mean as this Court is well aware,

---

[1]The court stated that the notes would be entered into the record, but they were not.

they needed to make a determination if the aggrava-
tors were proved beyond a reasonable doubt. I would
ask that this Court inquire of that. And then the sec-
ond issue was if the weighing process between the
aggravators and mitigators if they had in fact done a
weighing process, and I'd ask that this Court poll the
12 individual jurors and ask them individually if any
of them made the determination that the mitigation
outweighed the aggravations in this matter.

A second defense attorney clarified that Harrison wanted "to
ask whether or not they unanimously eliminated [the] death
penalty as a punishment because one of the notes to the Court
indicated just that." The State objected to this request by argu-
ing that "[t]he only way to make any determination as to
which verdicts they reached or a partial verdict that may have
been reached in this case is to look at the verdict form." In
response, Harrison's attorney acknowledged that "we don't
know if a verdict has been reached in the sense that there were
special verdict forms. They had to make a determination on
a special verdict form if the aggravators had been proved
beyond a reasonable doubt. That is something they could have
in fact reached."

In response to the parties' assertions, the court stated:

I think . . . if that form [containing the jury's find-
ings of aggravating factors] is blank and it has been
signed by the foreperson, then . . . that would indi-
cate that they did not find the existence of an aggra-
vating circumstance beyond a reasonable doubt. And
so then I think the State would be precluded from
seeking the death penalty in a subsequent hearing.

The problem is . . . if they found aggravators and
they found mitigators, until they actually fill out one
of the two verdict forms indicating the penalty, we
don't know what their weighing analysis was

because there's nothing on the mitigating form to say the jury having found these mitigators finds the mitigators outweigh the aggravators or the aggravators outweigh the mitigators. The only way for us to know that is to see what form is actually filled out. I suspect, of course, neither form is going to be filled out because they're deadlocked on the punishment.

What we don't know is whether or not they have in fact [made this finding] by virtue of the fact they're not considering the death penalty or at this point in time are not tied between some with the death penalty, that doesn't tell us where they are in terms of the aggravators and the mitigators.

The court then called the jury into the courtroom and engaged in the following colloquy with the foreperson:

THE COURT: The court has received notes from two members of the jury indicating that the jury is deadlocked and after deliberations is unable to reach a verdict. Is that your assessment of the situation?

THE FOREPERSON: Yes.

THE COURT: Do you feel that further deliberations could aid the jury, or do you feel that the jury is at an impossible impasse in terms of a punishment in this case?

THE FOREPERSON: I think it's at an impasse.

THE COURT: Has the jury completed any of the verdict forms?

THE FOREPERSON: Yes.

THE COURT: Would you please hand those forms to my bailiff.

THE FOREPERSON: All of them or just the —

THE COURT: All of them, please.

Based on the foregoing, the court declared a mistrial and discharged the jury. The court examined the jury's verdict forms, and noted that two of the four forms had been completed. The first two forms showed that the jury had found one aggravating factor (out of the two that the government had offered),[2] and twenty-four mitigating factors (all of the factors offered by the defense, as well as an additional factor added by the jury). The forms were signed by the foreperson. The jury was also given two forms on which to record Harrison's sentence. The first form was meant to be used if the jury "found that the aggravating circumstance or circumstances outweigh[ed] any mitigation circumstance or circumstances." If the jury so found, it would then have been able to select between a fixed term of imprisonment, life with the possibility of parole, life without parole, or death. The second form was meant to be used if the jury "found that the mitigation circumstance or circumstances outweigh[ed] any aggravating circumstance or circumstances." If the jury so found, it would have been able to select between a fixed term of imprisonment, life with the possibility of parole, or life without parole. The jury failed to mark or sign either of the latter two forms.

On June 20, 2007, approximately seven months after the penalty-phase jury had been discharged, Harrison filed a Motion to Strike the Death Penalty in the state trial court. Harrison argued that he should not be subjected to the death penalty because "[t]he jury decided, twelve to zero, against the use of the death penalty because they had each independently determined that Harrison's mitigating circumstances outweighed the aggravating circumstances of the crime." Harrison submitted affidavits from three former jurors which,

---

[2]The jury found "beyond a reasonable doubt" that "[t]he murder involved the mutilation of the victim."

according to Harrison, constituted "a crystal clear acquittal" of the death penalty. The three affidavits, dated February 17, 2006, March 22, 2006, and December 18, 2006,[3] were all substantially similar. They stated that "once inside the juror room, one juror announced that she had determined that the death penalty was 'off the table.' " The foreperson (who was one of the three affiants) then took a vote "to determine if all the jurors agreed that 'death was off the table,' or that death would not be an option during deliberation. The vote on this issue was twelve (12) to zero (0) in favor of removing death as a potential verdict." The three affidavits further stated "[t]hat my personal deliberation included weighing the mitigating evidence against the aggravating evidence and that I determined that the mitigation evidence outweighed the evidence of aggravation." Finally, the affidavits stated that, "if I had been polled by the Court before being excused from service, I would have answered that I had determined that the mitigating circumstances outweighed the aggravating circumstance."

The State countered by arguing that Harrison's post-trial juror affidavits did not constitute a verdict of acquittal. The State also introduced an affidavit from one of the jurors stating that "[t]he death penalty was never 'off the table' as a potential punishment option for me as a juror."[4]

On July 12, 2007, the state trial court denied the Motion to Strike the Death Penalty, and denied Harrison's request to

---

[3]Since the jury was discharged on November 27, 2006, we assume that the February and March affidavits were executed in 2007, rather than 2006.

[4]We mention the jurors' dueling affidavits only to explain the full context and procedural history of the case. We may not consider jurors' testimony addressing the jury's deliberative process unless the testimony "bear[s] on extraneous influences on the deliberation." *United States v. Pimentel*, 654 F.2d 538, 542 (9th Cir. 1981) (citing *Mattox v. United States*, 146 U.S. 140, 148-49 (1892); Fed. R. Evid. 606(b)). Here, it does not.

stay further penalty-phase proceedings. The next day, Harrison filed a "Petition for Writ of Mandamus, or in the Alternative, a Writ of Prohibition and Emergency Motion for Stay of Proceedings" with the Nevada Supreme Court. Harrison again argued that the juror affidavits established a "crystal clear acquittal" of the death penalty. The Nevada Supreme Court issued a preliminary stay of further penalty-phase proceedings, but on September 7, 2007, it denied Harrison's petition because "intervention by way of extraordinary writ is not warranted," and vacated the stay.

On June 20, 2008, Harrison filed a petition for a writ of habeas corpus under 28 U.S.C. § 2241 in the United States District Court for the District of Nevada. His petition raised two arguments: first, that he had been acquitted of the death penalty because the jurors had unanimously concluded that the mitigating factors outweighed the aggravating factors, and second, that the trial court erred by declaring a mistrial without polling the jurors to determine whether they had unanimously concluded that the mitigating factors outweighed the aggravating factors. Harrison's petition requested that the court order the State "to cease attempts at obtaining the death penalty" and order the state court "not to entertain any further capital proceedings . . . ."

The district court denied the writ after concluding that Harrison had failed to establish that he had been acquitted of the death penalty. The court concluded that the partially completed verdict forms failed to establish that the jury had concluded that the mitigating factors outweighed the aggravating factors. The court also concluded that the post-trial juror affidavits did not constitute a verdict. The court then denied the writ without addressing Harrison's argument that the trial court erred by declaring a mistrial without polling the jury concerning whether it had ruled out the death penalty.

On appeal here, Harrison no longer contends that the post-trial affidavits establish his acquittal of the death penalty.

Rather, Harrison argues that the Nevada trial court erred by declaring a mistrial without polling the jury to determine if it "had reached a unanimous verdict concerning the death penalty." A merits panel of our court stayed the pending state-court proceedings, granted the petition over Judge Silverman's dissent, *Harrison v. Gillespie*, 590 F.3d 823 (9th Cir.), *withdrawn and superseded*, 596 F.3d 551 (9th Cir. 2010), and a majority of the active nonrecused judges on our court voted to rehear the case en banc, 608 F.3d 1117 (9th Cir. 2010).

## JURISDICTION AND STANDARD OF REVIEW

We agree with the original panel majority's discussion of 28 U.S.C. § 2241 and the standard of review. *Harrison*, 596 F.3d at 559-61. Our precedent makes clear that 28 U.S.C. § 2241 is the proper vehicle for asserting a double jeopardy claim prior to (or during the pendency of) a successive trial. *See Wilson v. Belleque*, 554 F.3d 816, 822-24 (9th Cir.), *cert. denied*, 130 S. Ct. 75 (2009). The Supreme Court has explained that 28 U.S.C. § 2241 allows individuals who are "in custody under one sentence to attack a sentence which they had not yet begun to serve." *Braden v. 30th Judicial Circuit Court of Ky.*, 410 U.S. 484, 498 (1973). In light of the Supreme Court's precedents stating that the Double Jeopardy Clause can bar the state from re-seeking the death penalty in certain cases, *e.g.*, *Bullington v. Missouri*, 451 U.S. 430, 446 (1981), the principles discussed in *Wilson v. Belleque* are properly extended to the present case. In effect, Harrison is currently in custody under an indeterminate sentence for his first-degree murder conviction, and he is attacking the possibility of receiving a death sentence in the future. We therefore have jurisdiction under 28 U.S.C. § 2241.

For the reasons stated by the original panel majority, *Harrison*, 596 F.3d at 561, the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254, does not apply to this appeal. By its own terms 28 U.S.C. § 2254 applies only to individuals in "custody pursuant to the judg-

ment of a State court," and it is undisputed that the Nevada courts have not yet entered judgment against Harrison. Accordingly, we review the district court's conclusions de novo, and the state trial court's grant of a mistrial for abuse of discretion. *See Wilson*, 554 F.3d at 828; *Arizona v. Washington*, 434 U.S. 497, 510 & n.28 (1978).

Finally, as the district court noted, the *Younger* abstention doctrine, *see Younger v. Harris*, 401 U.S. 37 (1971), does not bar us from considering the merits of Harrison's Double Jeopardy Clause argument. *See Harrison v. Eighth Judicial Dist. Court of Nev.*, No. 2:08-cv-00802-RCJ-RJJ, 2008 WL 2570925, at *2 (D. Nev. June 25, 2008) (citing *Mannes v. Gillespie*, 967 F.2d 1310, 1312 (9th Cir. 1992)).

## DISCUSSION

### A.  The Role of Acquittals and Verdicts in Finding Double Jeopardy

**[1]**  The Fifth Amendment's Double Jeopardy Clause states that "[n]o person shall . . . be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. In *Bullington*, the Supreme Court held that the Double Jeopardy Clause applies to capital-sentencing proceedings that "have the hallmarks of [a] trial on guilt or innocence." 451 U.S. at 439. The Court explained that the Double Jeopardy Clause bars the retrial of a defendant following a determination that the "government . . . failed to prove its case[ ]." *Id.* at 442 (internal quotation marks omitted). The Court concluded that, although sentencing proceedings ordinarily are governed by discretionary judgments, the Double Jeopardy Clause applies to any sentencing proceeding that "*explicitly requires* the jury to determine whether the prosecution has 'proved its case.'" *Id.* at 444. If a trial-like sentencing proceeding is resolved in the defendant's favor, the Double Jeopardy Clause bars the state from subsequently seeking the same

sentence, because "[a] verdict of acquittal on the issue of guilt or innocence is, of course, absolutely final." *Id.* at 445.

The Supreme Court applied *Bullington* to a judicially imposed death sentence in *Arizona v. Rumsey*, 467 U.S. 203 (1984). In *Rumsey*, the trial judge concluded that the state failed to prove that any statutory aggravating factors were present. *Id.* at 205-06. Although this conclusion was reversed on appeal because it was premised on legal error, the Court held that the initial finding was preclusive because "an acquittal on the merits by the sole decisionmaker in the proceeding is final and bars retrial on the same charge." *Id.* at 211.

Later, in *Poland v. Arizona*, 476 U.S. 147 (1986), the trial judge erroneously concluded that the state had proven its case and, accordingly, imposed the death penalty. *Id.* at 149. The sentence was then reversed because the judge had relied on an aggravating factor that was not adequately supported by the record. *Id.* at 149-50. After remand, the trial judge again imposed the death sentence, but based his conclusion on a different aggravating factor that had not initially been found at the first sentencing. *Id.* at 150. The Court allowed the second death sentence to stand because the defendant was sentenced to death in the first proceeding, and "the law attaches particular significance to an acquittal." *Id.* at 156 (internal quotation marks omitted). Absent an "acquittal" in which the factfinder concludes that the prosecution failed to "prove[ ] its case," the Double Jeopardy Clause does not bar a retrial. *Id.* at 156-57 (internal quotation marks omitted).

**[2]** More recently, in *Sattazahn v. Pennsylvania*, 537 U.S. 101, 109-10 (2003), the Court addressed a petitioner's argument that he was acquitted of the death penalty when the trial court imposed a life sentence after the jury was deadlocked. Under the state sentencing scheme at issue in that case, the trial court was required to impose a life sentence if the jury failed to render a unanimous verdict in favor of the death penalty. *Id.* After the underlying conviction was reversed on

appeal, the state again sought the death penalty on retrial. *Id.* at 105. Addressing the petitioner's claim that the Double Jeopardy Clause barred the state's second attempt to obtain the death penalty, the Court emphasized that "the touchstone for double-jeopardy protection in capital-sentencing proceedings is whether there has been an 'acquittal.' " *Id.* at 109. The Court noted that the defendant's life sentence had been imposed by operation of a statute rather than the jury's factual conclusion that the state had not proven its case. *Id*. at 109-10. Absent an express or implied finding of guilt or innocence, the Court explained, a deadlocked jury is a "non-result" for double jeopardy purposes. *Id.* at 109.

In light of the Supreme Court's emphasis on acquittals as the "touchstone for double-jeopardy protection in capital-sentencing proceedings," *id.*, we proceed to an examination of the basic principles governing acquittals. We have explained that an acquittal may be either "express or implied by jury silence." *Brazzel v. Washington*, 491 F.3d 976, 981 (9th Cir. 2007). By definition, an express acquittal (or "acquittal in fact") requires that the jury return a verdict in favor of the accused. *See Black's Law Dictionary* 27 (9th ed. 2009). An implied acquittal occurs "when a jury convicts on a lesser alternate charge and fails to reach a verdict on the greater charge . . . ." *Brazzel*, 491 F.3d at 978. The Supreme Court recently examined the circumstances in which an implied acquittal can be inferred from a jury's findings. *Yeager v. United States*, 129 S. Ct. 2360 (2009). The Court explained that where a jury renders a verdict on one count but is deadlocked on another count, the government is barred from re-litigating factual issues that are conclusively resolved by the jury's "valid and final judgment" as to the count on which a verdict was reached. *Id.* at 2367, 2370; *see also Green v. United States*, 355 U.S. 184, 190-91 (1957) (holding that conviction for second-degree murder operates as implied acquittal on first-degree murder count).

**[3]** Thus, in a jury trial, an "acquittal," whether express or implied, occurs only when the jury renders a verdict as to all or some of the charges against a defendant. Accordingly, since *acquittals* are the "touchstone for double-jeopardy protection in capital-sentencing proceedings," *Sattazahn*, 537 U.S. at 109, then jury *verdicts* are an essential element in finding double jeopardy as well.[5] " '[A] jury has not reached a valid verdict until deliberations are over, the result is announced in open court, and no dissent by a juror is registered.' " *United States v. Nelson*, 692 F.2d 83, 84-85 (9th Cir. 1982) (quoting *United States v. Taylor*, 507 F.2d 166, 168 (5th Cir. 1975)); *see also United States v. Rastelli*, 870 F.2d 822, 834 (2d Cir. 1989) (noting that this rule is "well established") (collecting cases). In order to fulfill its essential functions, a jury must engage in group deliberations that result in a collective determination of guilt or innocence. *See Williams v. Florida*, 399 U.S. 78, 100 (1970). As then-Judge Kennedy explained for our court, the purpose of the deliberative process is to reach unanimity (or the requisite supermajority in some jurisdictions), which in turn "insure[s] that the views of each of the jurors have been fully considered and expressed." *United States v. Lopez*, 581 F.2d 1338, 1342 (9th Cir. 1978). "[T]he minority view [must] be examined and, if possible, accepted or rejected by the entire jury." *Id.* at 1341; *see also Johnson v. Louisiana*, 406 U.S. 356, 361 (1972). Because of the significance of the entire deliberative process, the jurors' preliminary votes in the jury room do not constitute a final

---

[5]There are two basic types of verdicts, general verdicts and special verdicts:

> "[I]f the jury announces only its ultimate conclusions, it returns an ordinary general verdict; if it makes factual findings in addition to the ultimate legal conclusions, it returns a general verdict with interrogatories. If it returns only factual findings, leaving the court to determine the ultimate legal result, it returns a special verdict."

*Williams v. Warden*, 422 F.3d 1006, 1009 (9th Cir. 2005) (quoting *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1031 (9th Cir. 2003)).

verdict, even if they are unanimous. *United States v. Chinchic*, 655 F.2d 547, 549-50 (4th Cir. 1981); *see also Taylor*, 507 F.2d at 168 (collecting cases). Instead, the verdict must be rendered by the jury in open court and accepted by the court in order to become final. *Nelson*, 692 F.2d at 84-85.[6] The court may also reject the jury's verdict if it is inconsistent or ambiguous. *See, e.g.*, *United States v. Freedson*, 608 F.2d 739, 741 (9th Cir. 1979) (per curiam).[7]

## B. Partial Verdicts and Nevada's Capital-Sentencing Regime

[4] The general principles discussed *supra* undercut Harrison's argument that a defendant can make an *ex post* request to bifurcate a penalty-phase proceeding in order to receive a "partial verdict of acquittal" on the death penalty. Nevada statutes establish a three-step procedure for imposing the death penalty. First, the jury must unanimously find that an aggravating factor is present beyond a reasonable doubt, Nev. Rev. Stat. § 175.554(3); *Hollaway v. State*, 6 P.3d 987, 996 (Nev. 2000) (en banc); that finding is considered a factual determination under Nevada law, *Johnson v. State*, 59 P.3d 450, 460 (Nev. 2002) (en banc) (per curiam). Second, each juror must individually conclude that the mitigating factors do not outweigh the aggravating factors, Nev. Rev. Stat. § 175.554(3); *Hollaway,* 6 P.3d at 996; that conclusion is "in

---

[6]Under Nevada law, in cases imposing the death penalty the jury must return a "written verdict." Nev. Rev. Stat. § 175.554(4) ("If a jury imposes a sentence of death, the jury shall render a written verdict signed by the foreman.").

[7]The parties may poll the jury in order "to ascertain for a certainty that each of the jurors approves of the verdict as returned." *Humphries v. Dist. of Columbia*, 174 U.S. 190, 194 (1899). Such a poll exists primarily to dispel uncertainty about the jury's verdict. *See, e.g.*, *Nelson*, 692 F.2d at 84-85; *United States v. Lustig*, 555 F.2d 737, 746 (9th Cir. 1977) (holding that trial court did not abuse its discretion by not conducting multiple polls of jury where none of the jurors expressed uncertainty or disagreement about the verdict).

part a factual determination" and in part "discretionary weighing" under Nevada law, *Johnson I*, 59 P.3d at 460. Third, the jury must unanimously decide to impose the death penalty rather than life without the possibility of parole, life with the possibility of parole, or a fixed sentence with the possibility of parole, Nev. Rev. Stat. § 200.030(4); *Hollaway,* 6 P.3d at 996; this is "a moral decision that is not susceptible to proof," *McConnell v. State (McConnell II)*, 212 P.3d 307, 315 (Nev. 2009) (en banc) (per curiam). If the jury is unable to agree upon a sentence, the trial court may either "sentence the defendant to life imprisonment without the possibility of parole or impanel a new jury to determine the sentence." Nev. Rev. Stat. § 175.556(1).

**[5]** The Nevada Supreme Court has explained that although juries are given special verdict forms to guide their analysis in these unbifurcated penalty-phase proceedings, these forms are not legally significant. *See Gallego v. State*, 23 P.3d 227, 239-40 (Nev. 2001) (en banc). Instead, the only conclusion of any significance is the jury's final sentencing decision.[8] *See id.* at 240 (holding that "a verdict form specifying [the jury's mitigation] findings is not required"); *see also* Nev. Rev. Stat. § 175.554(4). Contrary to Judge Reinhardt's suggestion in his separate dissent, the purpose of the penalty-phase proceeding under Nevada law is not simply to decide whether the defendant is legally eligible for a capital sentence and whether such a sentence should be imposed. *See* Reinhardt Dissent at 6192-93. Rather, the purpose of the penalty-phase proceeding is to impose a final sentence, whether it be life without the possibility of parole, life with the possibility of parole, a fixed term of years, or, in some cases, the death penalty. *See* Nev. Rev. Stat. § 200.030(4). In other words, unless the penalty-phase proceeding is bifurcated, the only

---

[8] If the sentence is death, however, the jury must also specify the aggravating circumstance(s) and conclude that the mitigating circumstances do not outweigh the aggravating circumstance(s). Nev. Rev. Stat. § 175.554(4).

jury determination of any significance—and the only one that is sufficiently final to constitute a "verdict" in the ordinary sense—is the jury's decision regarding which sentence to impose.

[6] In light of the structure of Nevada's capital-sentencing scheme, and the underlying principles discussed *supra*, Harrison was not automatically entitled under Nevada law to poll the deadlocked jury on the status of its deliberations in his unbifurcated capital-sentencing proceeding. *See Daniel v. State*, 78 P.3d 890, 906 (Nev. 2003) (en banc) (per curiam) (holding that trial "court [i]s not required to poll the jurors" regarding possible acquittal on death penalty). Although the jury may have reached preliminary conclusions at any of the three stages of its capital-sentencing inquiry—first, with respect to the presence or absence of aggravating circumstances, second, with respect to the balancing of the aggravating and mitigating circumstances, and third, with respect to the final "moral" decision to impose a particular sentence—Nevada law does not include any procedural mechanism in which the jury's preliminary determinations can be embodied in a valid final verdict in an unbifurcated penalty-phase proceeding such as Harrison's. Absent the jury's full deliberation and final decision regarding the defendant's sentence, a Nevada penalty-phase jury has not produced a "valid and final judgment" that constitutes a partial acquittal. *See Yeager*, 129 S. Ct. at *2367*.[9]

---

[9]It goes without saying—and Harrison has never argued as much—that the jury's partially completed special verdict forms do not constitute a partial verdict in his favor. Even if we were to conclude that these forms were properly "returned by the jury to the judge in open court," Nev. Rev. Stat. § 175.481, the forms provide no indication that the jury weighed the mitigating factors with the aggravating factor. This is an essential and required step in determining whether the death penalty may be imposed under Nevada law. *See* Nev. Rev. Stat. § 175.554(3).

## C.    The United States Constitution Does Not Create a Per Se Right to Polling in Harrison's Case

Harrison contends that even though the penalty phase was conducted as an unbifurcated proceeding, the Double Jeopardy Clause required that the trial judge, prior to discharging the deadlocked jury, should have polled the jury to determine if it had rejected the death penalty. As phrased in his opening brief, Harrison argues that "as a matter of federal constitutional law," "the jurors [should have] be[en] polled to confirm that they had unanimously rejected a sentence of death and were split between lesser sentences."

Undisputably, "a retrial following a 'hung jury' does not violate the Double Jeopardy Clause," *Richardson v. United States*, 468 U.S. 317, 324 (1984), and a "trial judge may discharge a genuinely deadlocked jury and require the defendant to submit to a second trial," *Washington*, 434 U.S. at 509. However, Harrison argues that the trial court committed constitutional error by concluding that the jury was "hung" when it may have actually reached a preliminary decision not to impose the death penalty.[10] We disagree, and conclude that

---

[10]As described *supra*, Nevada law does not recognize a "partial verdict of acquittal" in unbifurcated capital sentencing proceedings. The only "verdict" is the jury's final sentence. It is thus more appropriate to say that Harrison requested that the court inquire about the jury's preliminary determinations rather than a "partial verdict." In light of Nevada's capital-sentencing scheme, Harrison's proposed rule is not simply a requirement that trial courts inquire about a partial verdict on a distinct charge, as is the issue presented in all of the prior case law (except for *Daniel v. State*, 78 P.3d at 906, which like Harrison's case addressed a jury deadlock in Nevada capital-sentencing proceedings). Rather, Harrison essentially requested that the trial court submit special interrogatories to the jury in order to determine if any of the elements of the charge had been rejected. Although a Nevada penalty-phase jury must consider three distinct factual and legal issues, the jury is not presented with distinct charges or counts upon which it might render a partial verdict. Instead, the jury may render a final verdict only if it agrees upon a sentence; anything short of that final conclusion is merely a preliminary determination, not a verdict. Harrison's request therefore amounted to an attempt to elicit preliminary determinations on the various elements charged to the jury as a single inquiry.

such decisions are entrusted to the sound discretion of trial
judges, as they are properly positioned to determine whether
such a mid-deliberation inquiry is warranted in the circum-
stances.

At the outset, we note that there can be no reasonable dis-
pute that the jury was genuinely deadlocked regarding its
determination of Harrison's sentence under Nevada Revised
Statutes § 175.554(2)(c). Harrison never objected to the
court's conclusion that the jury was deadlocked, and Harrison
does not now challenge the accuracy of the court's conclusion
that the jury was unable to reach agreement as to his sentence.
Instead, our dissenting colleagues suggest that there was no
"manifest necessity" for declaring a mistrial, but overlook the
undisputed fact that the jury was genuinely deadlocked
regarding its final verdict. *See* Thomas Dissent at 6178-83,
6186-87. It is well established that "[a] 'mistrial premised
upon the trial judge's belief that the jury is unable to reach a
verdict has been long considered the classic basis for a proper
mistrial.' " *Renico v. Lett*, 130 S. Ct. 1855, 1863 (2010) (alter-
ations omitted) (quoting *Washington*, 434 U.S. at 509). Here,
neither Harrison's trial counsel, appellate counsel, nor our dis-
senting colleagues suggest that the jury was *not* deadlocked
regarding the issue presented to it—which sentence to impose
on Harrison.

Nevertheless, Harrison and our dissenting colleagues con-
tend that the trial court erred not because of its conclusion that
the jury was deadlocked, but because it failed to inquire about
whether the jury had decided to take the death penalty off the
table prior to discharging the jury. Harrison requested that the
trial court conduct three distinct inquiries. First, he requested
"that we inquire from the jurors how far along in the process
they were in this penalty phase . . . ." Next, he requested "that
this Court poll the 12 individual jurors and ask them individu-
ally if any of them made the determination that the mitigation
outweighed the aggravations in this matter." Finally, he

requested "on their way out to ask whether or not they unanimously eliminated the death penalty as a punishment . . . ."[11]

**[7]** The Supreme Court has "expressly declined to require the mechanical application of any rigid formula when trial judges decide whether jury deadlock warrants a mistrial." *Renico*, 130 S. Ct. at 1863 (internal quotation marks omitted). *Moreover, the Court has "never required a trial judge, before declaring a mistrial based on jury deadlock, to force the jury to deliberate for a minimum period of time, to question the jurors individually, to consult with (or obtain the consent of) either the prosecutor or defense counsel, to issue a supplemental jury instruction, or to consider any other means of breaking the impasse." Id.* at 1864 (emphasis added). In short, the Supreme Court has never adopted a per se rule regarding trial judges' responses to deadlocked juries. Instead, the Court has emphasized the importance of deferring to the trial judge's discretion in cases involving deadlocked juries. *Id.* at 1863-64; *Washington*, 434 U.S. at 510 n.28. Consistent with the Court's general approach to deadlocked juries, we conclude that trial judges are entitled to exercise their "sound discretion" when deciding whether to inquire into a jury's preliminary determinations before declaring a mistrial.

**[8]** Our conclusion is partially informed by two basic rationales: first, that a judge's inquiry into a preliminary jury determination can have a coercive effect on the jury, and second, that such an inquiry may elicit the jury's tentative or preliminary vote rather than its final verdict.

---

[11]Our discussion is intended to address not only Harrison's "polling" argument, but also the various "alternative means of determining whether Harrison had been acquitted of the death penalty" that the original panel majority listed: "for example, . . . asking the foreperson whether the jury had reached unanimous agreement as to whether the mitigators outweighed the aggravators, or . . . providing the jury with an additional verdict form and allowing it to report whether it had or could resolve that issue without agreeing on a sentence." *Harrison*, 596 F.3d at 566 n.14.

**[9]** On numerous occasions, the Supreme Court has warned trial judges to avoid coercing deadlocked jurors.[12] The Court has expressed concern that "trial judges might . . . 'employ coercive means to break [an] apparent deadlock,' thereby creating a 'significant risk that a verdict may result from pressures inherent in the situation rather than the considered judgment of all the jurors.' " *Renico*, 130 S. Ct. at 1863 (quoting *Washington*, 434 U.S. at 509-10). One concern is that "the judge appears to join one of the factions in a hung jury," which "thereby lends his prestige to the adherents of

---

[12]The Court has addressed two basic types of coercion: deliberate coercion by one of the parties, *e.g.*, *Remmer v. United States*, 350 U.S. 377, 381-82 (1956), or unintentional coercion by the court. The Court has held that it is permissible for courts to instruct dissenting jurors to be willing to reconsider their views, *Allen v. United States*, 164 U.S. 492, 501 (1896), and to poll them to determine whether further deliberations would be beneficial, *Lowenfield v. Phelps*, 484 U.S. 231, 240 (1988), but it has barred federal courts (though not state courts) from inquiring about the numerical breakdown of a divided jury, *Brasfield v. United States*, 272 U.S. 448, 450 (1926), and from requiring the jury to return a verdict, either explicitly, *Jenkins v. United States*, 380 U.S. 445, 446 (1965) (per curiam), or implicitly, *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 460, 462 (1978). Thus, although we have held that a court's mildly coercive conduct may be permissible, *see United States v. Madrid*, 842 F.2d 1090, 1095 (9th Cir. 1988) (collecting cases), the Supreme Court's case law indicates that trial courts must be careful not to interfere with the jurors' formation of personal opinions or the conduct of their collective deliberations, *e.g.*, *Remmer*, 350 U.S. at 382 ("[I]t is the law's objective to guard jealously the sanctity of the jury's right to operate as freely as possible from outside unauthorized intrusions purposefully made.").

Given the "delicacy" of the rights at stake, *United States v. Heriot*, 496 F.3d 601, 608 (6th Cir. 2007) (internal quotation marks omitted), we too have had occasion to discuss coercion in both direct appeals, *see United States v. Williams*, 547 F.3d 1187, 1205-07 (9th Cir. 2008) (court's conduct was coercive) (collecting cases), and in habeas actions, *e.g.*, *DeWeaver v. Runnels*, 556 F.3d 995, 1007-08 (9th Cir.) (state court's conduct was not coercive), *cert. denied*, 130 S. Ct. 183 (2009); *Packer v. Hill*, 291 F.3d 569, 578-81 (9th Cir.) (state court's conduct was coercive), *rev'd sub nom. Early v. Packer*, 537 U.S. 3 (2002) (per curiam); *Weaver v. Thompson*, 197 F.3d 359, 365-66 (9th Cir. 1999) (state court's conduct was coercive).

that faction" and affects the course of the jury's deliberations. Note, *On Instructing Deadlocked Juries*, 78 Yale L.J. 100, 137 (1968) (hereinafter *Deadlocked Juries*). The judge's partiality may be subtle, such as (for instance) directing her comments more toward the dissenting minority vote rather than the majority, *see Williams*, 547 F.3d at 1206-07 (distinguishing between cases in which judge does and does not know identity of dissenting juror), or encouraging the jury's "movement" toward unanimity, *Jiminez v. Myers*, 40 F.3d 976, 980-81 (9th Cir. 1994) (per curiam). Such judicial coercion, even if it is subtle and unintentional, creates an impermissible risk of interference with the dynamics of the jury process, *see generally Lowenfield*, 484 U.S. at 238-40, and studies have shown that a judge's response to deadlocked juries can have a significant distorting effect on the course of the jury's deliberations. *See* Sarah Thimsen et al., *The Dynamite Charge: Too Explosive for Its Own Good?*, 44 Val. U.L. Rev. 93, 109-10 (2009); *see also* Samantha P. Bateman, Comment, *Blast it All:* Allen *Charges and the Dangers of Playing with Dynamite*, 32 U. Haw. L. Rev. 323, 333-38 (2010) (detailing mock jury studies).

Our second concern about judicial coercion is the "risk that some jurors might mistakenly permit a tentative vote to become an irrevocable final vote and forgo the opportunity to gain new insights" through further deliberations. *United States v. DiLapi*, 651 F.2d 140, 147 (2d Cir. 1981). Although jury room voting is an important part of the jury's decision-making process, it is nothing more than a tool used to move toward a final unanimous conclusion. *See Deadlocked Juries*, *supra*, at 130 (describing how preliminary votes contribute to "the most effective use" of the jury's decision-making process). We agree with the many courts that have observed that a preliminary vote is nothing more than a tentative survey of the individual juror's views, and that "continuing deliberations might well have shaken views on counts previously considered." *Nelson*, 692 F.2d at 85.[13] This concern about finality

---

[13]This basic proposition has been articulated on numerous occasions by our sister circuits. *See, e.g.*, *Heriot*, 496 F.3d at 608; *United States v. Ben-*

is not merely a product of rigid adherence to the proper forms of jury procedure. Rather, it is a result of the fundamental importance that the jury reach a final, collective decision after full deliberation of the issues. *See Lopez*, 581 F.2d at 1341-42. Tentative individual views expressed in the jury room are far different from a true verdict, which must be unanimous, final, and, in order to ensure its accuracy, publicly announced and affirmed. *See Nelson*, 692 F.2d at 84-85. The importance of the deliberative process cannot be overstated. *Id.*

In light of these concerns about potential judicial coercion and the lack of finality in a jury's preliminary conclusions, it would be wholly inappropriate to create a per se requirement that judges must inquire into the possibility that a jury has reached a conclusion regarding a defendant's eligibility for the death penalty. Concerns about the integrity of the jury process are heightened in death penalty cases such as the present one. *See Lowenfield*, 484 U.S. at 238-39, 241. Coercion and non-finality are therefore even more important in capital cases than in non-capital cases.

The dissenters suggest that even without a per se polling requirement, the trial court abused its discretion under the facts of this case. However, their interpretation of "manifest necessity" is far different from the one described by the Supreme Court. They suggest that "manifest necessity" requires the trial court to consider reasonable alternatives to declaring a mistrial. *See* Thomas Dissent at 6181-82, 6186. However, in their extensive collection of case law on this point, they cite only two cases involving jury deadlock, and each of those cases is easily distinguishable.[14] Our colleagues

---

*edict*, 95 F.3d 17, 19 (8th Cir. 1996); *United States v. Wheeler*, 802 F.2d 778, 781 (5th Cir. 1986); *Chinchic*, 655 F.2d at 550.

[14]The jury was deadlocked in *United States v. Lara-Ramirez*, 519 F.3d 76, 85 (1st Cir. 2008), but the trial court "did not treat the reported deadlock as an important factor in its mistrial decision." Instead, both the trial

rely largely on the generic mistrial standard announced in *United States v. Bates*, 917 F.2d 388, 395-96 (9th Cir. 1991), while overlooking the deadlock-specific standard discussed in a number of our other cases: "the factors to be considered by the judge include the jury's collective opinion that it cannot agree, the length of the trial and complexity of the issues, the length of time the jury has deliberated, whether the defendant has made a timely objection to the mistrial, and the effects of exhaustion or coercion on the jury." *Rogers v. United States*, 609 F.2d 1315, 1317 (9th Cir. 1979).[15] This standard properly recognizes that the Supreme Court has never required trial courts to consider "reasonable alternatives" to discharging a genuinely deadlocked jury. In *Renico*, the Supreme Court explained that the Sixth Circuit's *Fulton v. Moore*, 520 F.3d 522, 529 (6th Cir. 2008), standard-which is nearly identical to the four-part *Bates* test relied upon by our dissenting colleagues, and like their analysis, requires trial courts to consider "reasonable alternatives" to mistrial—is *not* an accurate articulation of the Supreme Court's prior holdings. *Renico*, 130 S. Ct. at 1866-67. Instead, the Court has "never required a trial judge . . . to consider any . . . means of breaking the impasse." *Id.* at 1864. An impasse is an impasse, and as we have explained *supra*, the only conceivable "alternatives" present a serious risk of coercing jurors or eliciting non-final votes.

---

court and the court of appeals focused their analysis on the fact that one juror had a Bible in the jury room. *Id.*

In *United States v. Razmilovic*, 507 F.3d 130, 139-40 (2d Cir. 2007), the trial court relied entirely on the jury's note stating that it was deadlocked, and did not ask the jury foreperson to confirm the statement on the note or to continue deliberating, both of which the trial court did in Harrison's case.

[15]*See also United States v. Banks*, 514 F.3d 959, 974 (9th Cir. 2008); *United States v. Hernandez-Guardado*, 228 F.3d 1017, 1029 (9th Cir. 2000); *United States v. Cawley*, 630 F.2d 1345, 1348-49 (9th Cir. 1980); *Arnold v. McCarthy*, 566 F.2d 1377, 1387 (9th Cir. 1978); *United States v. See*, 505 F.2d 845, 851-52 (9th Cir. 1974).

**[10]** In Harrison's case, there is no clear indication in the record that the jury was not genuinely deadlocked over the sentencing verdict. Instead, this is a relatively straightforward case in which the jury was deadlocked and expressly informed the judge that it was unable to reach a verdict. The judge asked whether the jury was "unable to reach a verdict," and the foreperson said "[y]es." The judge also asked whether "the jury [wa]s at an impossible impasse in terms of a punishment in this case," and the foreperson answered that it was "at an impasse." Although the jury had sent a pair of notes suggesting that it was deadlocked between life with the possibility of parole and life without the possibility of parole, this indication alone is not a sufficient basis for us to conclude that the trial court abused its discretion by not inquiring further into the possibility that the jury had conclusively rejected the death penalty. Notably, none of the jurors objected when the foreperson agreed that the jury was "unable to reach a verdict" and was "at an impasse."

**[11]** At no point during the proceeding did any of the jurors suggest that the jury had conclusively and finally determined after full deliberation that the death penalty could not be applied to Harrison. The trial court was concerned both that a jury poll "could have been a compromise" vote that did not fully reflect the jurors' considered deliberations, and that "the case took a lot longer than . . . any of us anticipated" and some of the jurors appeared "frustrated" about returning for the final day of deliberations. In other words, the trial court was properly concerned that any inquiry into the jury's deliberations would implicate the central concerns articulated here: the possibility of coercing the jury to reach a verdict, and the possibility of treating a preliminary jury vote as a final conclusive determination. The trial court was evidently aware of the relevant legal concerns and concluded that an inquiry into the jury's preliminary determinations was unnecessary given the circumstances. The trial court accordingly exercised its "sound discretion" in rejecting Harrison's request to inquire

further about the possibility that the jury rejected the death penalty.

## CONCLUSION

**[12]** We hold that capital defendants do not have a per se constitutional right to inquire about the possibility that a penalty-phase jury has reached a preliminary decision against imposing the death penalty. We conclude that such a mandatory right would lead to an unacceptable risk that the trial court's conduct would coerce the jury into reaching a compromise it might not otherwise reach, or encourage the jury to treat a preliminary jury room vote as a decisive final verdict. In reaching this conclusion, we reaffirm two basic principles. First, a jury's verdict is a final collective decision that is reached after full deliberation, consideration, and compromise among the individual jurors. Second, when jurors are deadlocked, we defer to the trial courts' exercise of "sound discretion" in determining that the jury is in fact genuinely and hopelessly deadlocked. In light of these two principles, we further conclude that trial judges are entrusted with "sound discretion" when deciding whether to inquire about the possibility that a jury has reached a partial decision. Applying these conclusions to Harrison's appeal, we hold that the trial court did not abuse its discretion by refusing to poll the jury where the jurors were clearly deadlocked, appeared frustrated after lengthy proceedings, may have been inclined to treat a preliminary compromise as a final verdict, and never indicated that they had reached a final finding acquitting Harrison of the death penalty. We also hold that in the retrial of the penalty phase the Double Jeopardy Clause does not preclude the State from including the death penalty as a sentencing option.

The district court's order denying Harrison's petition is accordingly

**AFFIRMED**.

THOMAS, Circuit Judge, with whom REINHARDT, FLETCHER, FISHER, and BERZON, Circuit Judges, join, dissenting:

By all indications, the jurors in James Harrison's capital trial had decided to acquit him of the death penalty. They had informed the trial judge that they were deadlocked between life with parole and life without parole. The trial judge acknowledged that the jury "was not discussing the death penalty." However, rather than conduct the jury poll requested by defense counsel to ascertain whether the jury had reached, or could reach, a verdict on the death penalty, the trial judge summarily declared the trial over and discharged the jury.

We will never know with certainty what the jury would have answered if asked. But we do know this: Harrison's chance of a likely acquittal on the death penalty left the courthouse with the jurors.

The Double Jeopardy Clause protects the "valued right of a defendant to have his trial completed *by the particular tribunal* summoned to sit in judgment on him." *Downum v. United States*, 372 U.S. 734, 736 (1963) (emphasis added). Put another way, "[c]riminal defendants have a right to have the jury first impaneled to try them reach a verdict." *United States v. Bates*, 917 F.2d 388, 392 (9th Cir. 1991). Thus, a defendant may not be tried on the same issue again if a mistrial is declared without his consent and without "manifest necessity." *United States v. Perez*, 22 U.S. (9 Wheat.) 579, 580 (1824).

There was no need, much less manifest necessity, for discharging the jury in this case without conducting the requested jury poll that would have answered the question of whether the jurors had reached a death penalty verdict. The trial judge violated Harrison's right to have the "particular tribunal give complete consideration to his case." *United States v. Sammaripa,* 55 F.3d 433, 434 (9th Cir. 1995). Harrison was

deprived of a likely acquittal, and the Double Jeopardy Clause prevents him from being subject to the death penalty again.

I

"[T]he Supreme Court has consistently recognized a major purpose of the double jeopardy clause as the protection of a defendant's 'valued right to have his trial completed by a particular tribunal.' " *Bretz v. Crist*, 546 F.2d 1336, 1345 n.21 (9th Cir. 1976) *(quoting Wade v. Hunter*, 336 U.S. 684, 689 (1949)) (collecting cases), *aff'd*, 437 U.S. 28 (1978). This right, which has "roots deep in the historic development of trial by jury in the Anglo-American system of criminal justice," *Crist v. Bretz*, 437 U.S. 28, 36 (1978), is " 'valued . . . because . . . the defendant has a significant interest in the decision whether or not to take the case from the jury when circumstances occur which might be thought to warrant a declaration of mistrial.' " *Arizona v. Washington*, 434 U.S. 497, 508 n.25 (1978) (quoting *United States v. Jorn*, 400 U.S. 470, 485 (1971) (plurality opinion)). As the Court explained:

> The reasons why this "valued right" merits constitutional protection are worthy of repetition. Even if the first trial is not completed, a second prosecution may be grossly unfair. It increases the financial and emotional burden on the accused, prolongs the period in which he is stigmatized by an unresolved accusation of wrongdoing, and may even enhance the risk that an innocent defendant may be convicted. The danger of such unfairness to the defendant exists whenever a trial is aborted before it is completed. Consequently, as a general rule, the prosecutor is entitled to one, and only one, opportunity to require an accused to stand trial.

*Id.* at 503-05 (footnotes omitted).

Accordingly, trial courts must use caution in deciding whether or not to grant a mistrial *sua sponte*. As Justice Stevens has noted, the Supreme Court has

> repeatedly reaffirmed that the power to discharge the jury prior to verdict should be reserved for "extraordinary and striking circumstances," *Downum*[, 372. U.S. at 736] (internal quotation marks omitted); that the trial judge may not take this "weighty" step, [*Illinois v. Somerville*, 410 U.S. 458, 471 (1973)], unless and until he has "scrupulous[ly]" assessed the situation and "take[n] care to assure himself that [it] warrants action on his part foreclosing the defendant from a potentially favorable judgment by the tribunal," [*Jorn*, 400 U.S. at 485]; that, to exercise sound discretion, the judge may not act "irrationally," "irresponsibly," or "precipitately" but must instead act "deliberately" and "careful[ly]," *Washington*, 434 U.S.[ at 514-15]; and that, in view of "the elusive nature of the problem," mechanical rules are no substitute in the double jeopardy mistrial context for the sensitive application of general standards, *Jorn*, 400 U.S.[ at 485].

*Renico v. Lett*, ___ U.S. ___, 130 S. Ct. 1855, 1869 (2010) (Stevens, J., dissenting).

Of course, under certain circumstances, the defendant's right to have his case completed before a particular tribunal must "be subordinated to the public's interest in fair trials designed to end in just judgments." *Wade*, 336 U.S. at 689. Hence, we have the "manifest necessity" rule. The rule is not one of recent judicial invention. Indeed, the "classic formulation of the test," which "has been quoted over and over again to provide guidance in the decision of a wide variety of cases," *Washington*, 434 U.S. at 506, comes from Justice Story's opinion in *Perez*:

> [T]he law has invested Courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere. To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes; and, in capital cases especially, Courts should be extremely careful how they interfere with any of the chances of life, in favour of the prisoner. But, after all, they have the right to order the discharge; and the security which the public have for the faithful, sound, and conscientious exercise of this discretion, rests, in this, as in other cases, upon the responsibility of the Judges, under their oaths of office.

22 U.S. (9 Wheat.) at 580.

"The rule announced in the *Perez* case has been the basis for all later decisions of [the Supreme Court] on double jeopardy." *Wade*, 336 U.S. at 690; *accord. Renico*, ___ U.S. at ___, 130 S. Ct. at 1862-64. Accordingly, it is well-settled that "[a]fter jeopardy attaches, the court's declaration of a mistrial . . . does not bar retrial where the mistrial was declared because of 'manifest necessity.' " *Sammaripa,* 55 F.3d at 434 (quoting *Thomas v. Municipal Court of Antelope Valley J.D.*, 878 F.2d 285, 287 (9th Cir. 1989)).

"[T]he *Perez* doctrine of manifest necessity stands as a command to trial judges not to foreclose the defendant's" right to a decision by a particular tribunal "until a scrupulous exercise of judicial discretion leads to the conclusion that the ends of public justice would not be served by a continuation of the proceedings." *Jorn*, 400 U.S. at 485. It entails a

"heavy" burden before a mistrial can be declared *sua sponte*. *Washington*, 434 U.S. at 505.

As one would expect, "a jury's inability to reach a decision is the kind of 'manifest necessity' that permits the declaration of a mistrial." *Yeager v. United States*, ___ U.S.___, 129 S. Ct. 2360, 2366 (2009) (citing *Washington*, 434 U.S. at 505-06; *Perez*, 22 U.S. (9 Wheat.) at 580). In such circumstances, we rightly afford great deference to the trial court's decision, but its discretion in this respect is not unfettered: as the Supreme Court has recently observed,

> *Perez* itself noted that the judge's exercise of discretion must be "sound," [22 U.S. (9 Wheat.) at 580], and we have made clear that "[i]f the record reveals that the trial judge has failed to exercise the 'sound discretion' entrusted to him, the reason for such deference by an appellate court disappears." *Washington*, [434 U.S. at 510 n.28].

*Renico*, ___ U.S. at ___, 130 S. Ct. at 1863.

In synthesizing Supreme Court jurisprudence, we have applied four factors in determining whether a trial court has exercised its discretion properly in finding "manifest necessity" and granting a mistrial: namely, whether it has "(1) heard the opinions of the parties about the propriety of the mistrial, (2) considered the alternatives to a mistrial and chosen the" course of action "least harmful to a defendant's rights, (3) acted deliberately instead of abruptly, and (4) properly determined that the defendant would benefit from the declaration of mistrial." *Bates*, 917 F.2d at 396.

As to the first *Bates* factor, we have held that the manifest necessity requirement was not met when the trial court "allowed no opportunity for argument from either side on the need for a mistrial." *United States v. Sanders*, 591 F.2d 1293, 1298 (9th Cir. 1979). Similarly, in *Jorn*, the Supreme Court

held that the trial court abused its discretion in discharging the jury without hearing from counsel. 400 U.S. at 487.

The second key consideration in assessing the "manifest necessity" of declaring a mistrial *sua sponte* is whether the trial judge adequately considered alternatives. The Supreme Court emphasized the importance of this factor in *Jorn*, noting that the trial judge had not considered alternatives and "made no effort to exercise a sound discretion to assure that, taking all the circumstances into account, there was a manifest necessity for the *sua sponte* declaration of this mistrial." 400 U.S. at 487.

Our sister circuits have also emphasized that no "manifest necessity" exists where there are reasonable alternatives to declaring a mistrial. In *United States v. Rivera*, 384 F.3d 49 (3d Cir. 2004), the Third Circuit held that the Double Jeopardy Clause barred reprosecution because the district court did not "giv[e] due consideration to reasonably available alternatives to the drastic measure of a mistrial." *Id.* at 56 ("Critically, a mistrial must not be declared without prudent consideration of reasonable alternatives."); *see also Love v. Morton*, 112 F.3d 131, 137 (3d Cir. 1997) ("To demonstrate manifest necessity, the state must show that under the circumstances the trial judge 'had no alternative to the declaration of a mistrial.' . . . The trial judge must consider and exhaust all other possibilities." (citation omitted) (quoting *United States v. McKoy*, 591 F.2d 218, 222 (3d Cir. 1979))). As the Third Circuit concluded in *Rivera*, "[w]here a District Court *sua sponte* declares a mistrial in haste, without carefully considering alternatives available to it, it cannot be said to be acting under a manifest necessity." 384 F.3d at 56. The First, Second, Fourth, Fifth, Sixth, Seventh, Eighth, Tenth, and Eleventh circuits have reached a similar conclusion.[1] Our own

---

[1] *See United States v. Lara-Ramirez*, 519 F.3d 76, 88 (1st Cir. 2008) ("'Where there is a viable alternative to a mistrial and the district court fails adequately to explore it, a finding of manifest necessity cannot

circuit's precedent on the matter could not be more clear. *See Bates*, 917 F.2d at 396 ("A trial court should consider and correctly evaluate the alternatives to a mistrial.").

The third factor is whether the trial court acted deliberately or abruptly. The Supreme Court has held that a trial court abuses its discretion in granting a mistrial when it acts precipitately. *Washington*, 434 U.S. at 514-15. In *Jorn*, the Court held that the Double Jeopardy Clause precluded retrial when the trial judge's abrupt declaration of mistrial provided the defendant with no opportunity to object to the discharge of the jury. 400 U.S. at 487. As we noted in *Bates*, "[a] trial court's

_____

stand.' " (quoting *United States v. Toribio-Lugo*, 376 F.3d 33, 39 (1st Cir. 2004)); *United States v. Razmilovic*, 507 F.3d 130, 138-39 (2d Cir. 2007) (citing *Dunkerley v. Hogan*, 579 F.2d 141, 147 (2d Cir. 1978), *cert. denied*, 439 U.S. 1090 (1979)); *United States v. Shafer*, 987 F.2d 1054, 1057 (4th Cir. 1993) ("In order to determine if the mistrial was required by manifest necessity, the critical inquiry is whether less drastic alternatives were available."); *United States v. Fisher*, 624 F.3d 713, 722 (5th Cir. 2010) ("manifest necessity" only justifies the *sua sponte* declaring of a mistrial where "the government . . . show[s] that the district court carefully considered whether reasonable alternatives existed and that the court found none"); *Johnson v. Karnes*, 198 F.3d 589, 596 (6th Cir. 1999) (in concluding that the Double Jeopardy Clause barred reprosecution, finding it "significant that the trial court judge failed to consider less drastic alternatives, but instead immediately decided that a mistrial was appropriate"); *Lovinger v. Circuit Court of the 19th Judicial Circuit, Lake County, Ill.*, 845 F.2d 739, 746 (7th Cir. 1988) ("Whether or not options short of mistrial were feasible and preferable . . . , the court did not consider them and thus did not afford proper solicitude for [the defendant's] valued right to continue with the trial."); *Moussa Gouleed v. Wengler,* 589 F.3d 976, 981 (8th Cir. 2009) ("In determining whether a mistrial is justified by manifest necessity, we are particularly concerned with whether less drastic alternatives were available." (citations and internal quotations omitted)); *Walck v. Edmondson,* 472 F.3d 1227, 1240 (10th Cir. 2007) ("Because the trial judge did not consider . . . viable alternatives, manifest necessity did not require a mistrial."); *United States v. Quiala*, 19 F.3d 569, 572 (11th Cir. 1994) ("The lack of consideration of alternatives to a mistrial subjects the district court's abrupt declaration of a mistrial to close appellate scrutiny.").

abrupt declaration of a mistrial suggests that it failed to exercise sound discretion." 917 F.2d at 396; *see also Lovinger*, 845 F.2d at 746 ("abrupt and precipitate action . . . is inconsistent with the exercise of sound discretion under the 'manifest necessity' test"). On the other hand, evidence of deliberation by the trial court indicates that it exercised sound discretion. *See Washington*, 434 U.S. at 516 (praising the trial judge for acting "responsibly and deliberately" and for "accord[ing] careful consideration to [the defendant's] interest in having the trial concluded in a single proceeding"); *United States v. Elliot*, 463 F.3d 858, 867 (9th Cir. 2006) ("Rather than hastily declaring a mistrial, the district court made every effort to resolve the conflict and continue the trial.").

The fourth factor is whether the court properly determined that the defendant would benefit from the declaration of mistrial. As we noted in *Bates,* a well-founded determination that the mistrial would assist the defendant indicates the exercise of sound discretion; an erroneous declaration that the mistrial would assist the defendant may warrant reversal, as might a mistrial declaration that assists only the government. 917 F.2d at 388.

The manifest necessity doctrine also requires, in addition to consideration of the traditional *Bates* factors, that the trial judge exercise particular care when it appears that the proceedings might result in an acquittal. Indeed, the Double Jeopardy Clause "prevents a prosecutor or judge from subjecting a defendant to a second prosecution by discontinuing the trial when it appears that the jury might not convict." *Green v. United States,* 355 U.S. 184, 188 (1957). It is improper for a court to declare a mistrial and grant the state, "with all its resources and power," *id.* at 187, "another, more favorable opportunity to convict the accused," *Gori v. United States*, 367 U.S. 364, 369 (1961).

Finally, the manifest necessity doctrine requires that greater care be exercised in death penalty cases. It commands that "in

capital cases especially, Courts should be extremely careful how they interfere with any of the chances of life, in favour of the prisoner." *Perez*, 22 U.S. (9 Wheat.) at 580.

## II

When we apply these principles to this capital case, it is readily apparent that no manifest necessity justified the trial judge in declaring a mistrial without permitting the jury poll that Harrison requested.

First, the record is absolutely, crystal clear that the jury might have determined that Harrison should not be put to death. The trial court commenced the discussion with this report:

> THE COURT: For the record, we had two notes from two different jurors indicating that the jury was deadlocked between life with and life without [the possibility of parole].

The trial court then observed that "*the fact that they're not considering the death penalty*" did not "tell us where they are in terms of the aggravators and the mitigators." Thus, the court noted, it was important to see the actual verdict forms if the jury had filled them out.

The court then called the jury back and asked the jury foreperson where matters stood. The foreperson replied: "I think it's at an impasse." Then, the court inquired whether any of the forms had been completed. The foreperson replied that some forms had been completed. The court instructed the foreperson to hand the forms to the bailiff and, without examining them, summarily discharged the jury. The court did not ask counsel whether they objected to the declaration of mistrial and the discharge of the jury. The court did not invite or consider any alternatives. The court did not make a finding that manifest necessity required a mistrial.

One of the completed and signed jury forms indicated that the jury had found one aggravating factor. The other completed and signed form indicated that the jury had found twenty-four mitigating factors. The forms regarding weighing of the factors and the imposition of punishment were not filled out. Later, three jurors submitted affidavits indicating that the death penalty was "off the table." One submitted an affidavit stating that it was not.

We do not, of course, know with assurance what verdict the jury would have eventually rendered on the sole question of whether Harrison was to be put to death. We do not even know whether the jury was deadlocked on that question. However, every single bit of record evidence demonstrates a high probability that the jury would not have imposed a death sentence, if the question had been posed.[2]

Second, given the application of Nevada capital sentencing law to these facts, the poll Harrison requested would have been sufficient to determine whether the jury had acquitted him of the death penalty. In signing the verdict forms indicating a finding of one aggravating factor and twenty-four mitigating factors, the jury made one of the two factual findings necessary to establish Harrison's statutory eligibility for the death penalty. *See* Nev. Rev. Stat. § 175.554(3). Had the trial court conducted the poll Harrison requested and, prior to declaring a mistrial, simply asked the jury if it had determined whether the mitigating factors outweighed the aggravating factor, we would know, according to Nevada law, whether the jury unanimously " 'agree[d] . . . that the prosecution ha[d] not proved its case' " that Harrison deserved to die. *Poland v.*

---

[2]In addition to the record evidence indicating a high probability of an eventual life sentence verdict, a recent study concluded that in eighty-nine percent of juries in the studied capital cases, the eventual penalty verdict was the outcome favored by the majority of jurors on the first vote. Scott E. Sundby, *War and Peace in the Jury Room: How Capital Juries reach Unanimity*, 62 Hastings L.J. 103, 107 (2010).

*Arizona*, 476 U.S. 147, 152 (1986) (quoting *Bullington v. Missouri*, 451 U.S. 430, 443 (1981)). And had the poll results established as much, that would constitute a "finding[ ] sufficient to establish legal entitlement to the life sentence." *Sattazahn v. Pennsylvania*, 537 U.S. 101, 108 (2003).

When the trial court declared a mistrial without polling the jurors as Harrison requested, it deprived Harrison of his right under the Double Jeopardy Clause to have his case completed by the tribunal summoned to sit in judgment on him. In doing so, the court prevented the jury from giving legal effect to whatever conclusions it had reached,[3] and likely acquitting Harrison of the death penalty. By putting him again in jeopardy of being put to death, the court permitted the state "another, more favorable opportunity to convict the accused," an opportunity that, but for manifest necessity, the Double Jeopardy Clause forbids. *Gori*, 367 U.S. at 369.

Given the particular care required in making mistrial decisions when it appears that a jury might not convict and, more, in capital cases, what was the manifest necessity here? A careful review of the record in light of the *Bates* factors can only lead to one conclusion: there absolutely was no reason, much less one compelling enough to meet the high "manifest necessity" standard, for discharging the jury without polling it as Harrison requested.

First, the trial court did not ask the parties about the propriety of declaring a mistrial. The record shows that the judge informed counsel about the jury note, defense counsel asked

---

[3]The Double Jeopardy Clause "should be understood to safeguard not simply the individual defendant's interest in avoiding vexation, but also the integrity of the initial petit jury's judgment." Akhil Reed Amar, *The Bill of Rights as a Constitution*, 100 Yale L.J. 1131, 1190 (1991). Indeed, there runs through "the Anglo-American system of criminal justice . . . a strong tradition that once banded together a jury should not be discharged until it ha[s] completed its solemn task of announcing a verdict." *Crist*, 437 U.S. at 36 (1978).

for a poll of the jury, and the government opposed the poll. Critically, the judge did not invite or entertain argument about a mistrial after the foreperson reported in open court that the jury had, in fact, completed two verdict forms.

Second, the trial court did not consider any alternatives. In fact, the judge never expressly denied defense counsel's request for a jury poll—a viable alternative she rejected out-of-hand when she declared a mistrial and dismissed the jury. She ignored other viable alternatives as well. The judge could have asked the jury whether it was deadlocked on the imposition of the death penalty. The judge could have given an *Allen* charge[4] or its equivalent under Nevada state law.[5] However, the judge neither considered the possibility nor asked counsel as to their views of providing the jury with additional instructions. She did not ask the parties if they saw any alternatives to a mistrial. In short, the trial judge did not meaningfully consider other courses of action, much less determine which was the one "least harmful to [Harrison's] rights." *Bates*, 917 F.2d at 396.

Third, the trial judge demonstrated none of the deliberation that courts have approved as indicia of a sound exercise of discretion. Rather, the court accepted the foreperson's representation of deadlock and promptly discharged the jury without further ado. The entire exchange with the jury foreperson and the discharge occupies less than a single transcript page.

Fourth, the trial judge made no determination of whether declaring a mistrial would benefit the defendant. In fact, as discussed, the mistrial severely prejudiced Harrison's rights.

In sum, consideration of the *Bates* factors compels the conclusion that there was no "manifest necessity" for the judge to declare a mistrial without conducting the poll Harrison

---

[4]*See Allen v. United States*, 164 U.S. 492 (1896).

[5]*See Wilkins v. State*, 96 Nev. 367, 373-74 n.2 (1980).

requested. Especially in light of the stakes—this is a capital case where the jury likely acquitted Harrison of the death penalty—the conclusion is clear: the Double Jeopardy Clause prevents subjecting the defendant to the death penalty on retrial. As the Supreme Court observed in *Washington*, if a judge "discharges the jury when further deliberations may produce a fair verdict, the defendant is deprived of his valued right to have his trial completed by a particular tribunal." 434 U.S. at 509 (quotation marks omitted). The jury in this case was discharged when it was likely that it had reached agreement, or could reach agreement, on whether to impose the death penalty. The Constitution forbids Harrison from being placed in jeopardy of death a second time.

## III

Rather than defend the manifest necessity of declaring a mistrial without polling the jury, the government urges affirmance by slaying a stand of straw men and producing a parade of horribles.

The government ardently argues that there was no actual acquittal in this case and therefore that Double Jeopardy protections do not apply. Of course Harrison was not acquitted. But "[t]he prohibition is not against being twice punished, but against being twice put in jeopardy." *Ball v. United States*, 163 U.S. 662, 669 (1896). The right at issue here is Harrison's right to have the trial completed by the jury impaneled to sit in judgment on him. The fact that the trial was not completed demonstrates the violation of the right, not the vindication of it.

The government argues that criminal defendants are not entitled to a *per se* rule requiring jury polling. Perhaps so, but that question is irrelevant to the issue of manifest necessity. The Supreme Court has emphasized, time and again, that the determination of manifest necessity must be done on a case-by-case basis, in a fact-specific context. The manifest neces-

sity test "command[s] courts in considering whether a trial should be terminated without judgment to take 'all circumstances into account' and thereby forbid[s] the mechanical application of an abstract formula." *Wade*, 336 U.S. at 691. The standard cannot

> be applied . . . without attention to the particular problem confronting the trial judge. Indeed, it is manifest that the key word "necessity" cannot be interpreted literally; instead, contrary to the teaching of Webster, we assume that there are degrees of necessity and we require a "high degree" before concluding that a mistrial is appropriate.

*Washington*, 434 U.S. at 506; *see also Somerville*, 410 U.S. at 462 (the test "abjures the application of any mechanical formula by which to judge the propriety of declaring a mistrial in the varying and often unique situations arising during the course of a criminal trial"); *Jorn*, 400 U.S. at 450 (eschewing "mechanical rules"). As we said in *Bates*, "[c]ourts steadfastly continue to refuse to categorize fact patterns that constitute manifest necessity and fact patterns that do not." 917 F.2d at 394. The absence of a *per se* rule on jury polling is not relevant to the case-specific application of the manifest necessity doctrine.

The government worries that granting relief in this case will create a rule of juror coercion. The law of juror coercion has been settled for a long time. The doctrine of manifest necessity is of even longer lineage. The two have lived comfortably together for centuries of American jurisprudence. Trial judges walk difficult lines between competing rights every day. Holding that, under these particular circumstances, a trial judge discharged a jury without manifest necessity would not alter the settled law of juror coercion at all.

The government contends that the trial judge was not permitted under Nevada law to poll the jury. However, none of

the statutory provisions cited would have posed a barrier to granting Harrison's request. The first statute, Nev. Rev. Stat. § 50.065, prohibits inquiry as to the juror's mental processes. There was nothing in Harrison's request that remotely posed that danger. The second statute, Nev. Rev. Stat. § 175.531, requires the jury to be polled at the request of a party after the jury returns a verdict. It does not address the circumstance at bar. The third statute, Nev. Rev. Stat. § 175.556(1), provides that when a jury is at an impasse in a capital case, the judge has the option of imposing a life sentence without the possibility of parole or impaneling a new jury. There is nothing in that provision that prohibits a judge from taking measures to ascertain whether the jury had made a decision regarding the death penalty. There is nothing in Nevada law that would have prohibited the judge from granting Harrison's request for a poll, or asking whether the jury was at an impasse as to the imposition of the death penalty.

None of these diversions address the key issue in this case, whether there was a manifest necessity for the trial judge to discharge the jury *sua sponte*. The trial court's actions satisfied none of the standards that we have held important in finding manifest necessity. When it was likely that the defendant would be acquitted of the death penalty, the trial judge *sua sponte* declared a mistrial—without proper consultation or deliberation, and without conducting the jury poll Harrison requested or even asking the jurors whether they were deadlocked regarding the death penalty. The trial court's decision to discharge the jury deprived Harrison of his right to be tried by the jury impaneled to sit in judgment on him. The violation of that right precludes the government from seeking for a second time to impose a penalty of death.

For these reasons, I disagree with my friends in the majority and must respectfully dissent.

REINHARDT, Circuit Judge, with whom Thomas, Circuit Judge, joins, dissenting:

I join in Judge Thomas's dissent, which so ably demonstrates that the trial judge's hasty decision to dismiss the jury violated every tenet of the law regarding "manifest necessity" for the declaration of a mistrial, and thus Harrison's right to be free from double jeopardy. I write separately to emphasize that the trial court's declaration of a mistrial when there was no manifest necessity to do so was based on a fundamental misunderstanding of the function of a capital sentencing proceeding. By her actions, the trial judge precluded Harrison from obtaining confirmation that, as seems likely, the jury had found him ineligible for death, and that the Double Jeopardy Clause thus barred him from being sentenced to death in any subsequent sentencing proceedings. *See Bullington v. Missouri*, 451 U.S. 430, 446 (1981).[1]

In response to the dissenting opinions, the majority acknowledges that the relevant test for whether the trial court's declaration of a mistrial violates the Double Jeopardy Clause's protections is whether there was a "manifest necessity" to declare a mistrial. *See, e.g.*, *United States v. Jorn*, 400 U.S. 470, 481 (1971); *United States v. Chapman*, 524 F.3d 1073, 1081 (9th Cir. 2008). Whether "manifest necessity" for a mistrial exists is an inquiry that depends upon "the varying and often unique situations arising during the course of a criminal trial." *Illinois v. Somerville*, 410 U.S. 458, 462 (1973). Here, the "unique situation" facing the trial judge was a sentencing hearing the central purpose of which was to determine whether Harrison was eligible for a capital sentence. *See* Nev. Rev. Stat. 175.554. The trial judge nonethe-

---

[1]In *Sattazahn v. Pennsylvania*, 537 U.S. 101 (2003), the Supreme Court held that an "acquittal" of the death sentence can occur only when a jury unanimously finds that the prosecution failed to prove the statutory criteria for death eligibility, but does not occur when a sentence other than death is imposed without such a finding. *See id.* at 112-13.

less dismissed the jury without making any effort to determine whether it had arrived at a unanimous conclusion on this question or whether it would be able to do so given more of an opportunity to deliberate. Under the unique circumstances presented by a capital sentencing proceeding, the declaration of a mistrial without any attempt to determine whether the jury had arrived at, or could arrive at, a verdict regarding the critical issue that it was convened to answer fails to satisfy the "manifest necessity" test, and thus violates the Double Jeopardy Clause. *See Somerville*, 410 U.S. at 459.[2]

The fundamental reason why, unlike run-of-the-mill offenses, capital crimes generally provide for separate sentencing proceedings is not, as the majority asserts, to arrive at some sort of sentence, such as life with parole or life without parole or even a lesser punishment, after it arrives at its answer as to death eligibility.[3] *Maj. Op.* at 6165-66. Rather, separate capital sentencing proceedings were implemented by states in the late 1970s for the specific purpose of complying with the Supreme Court's mandate that "where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared,

---

[2]To the extent that the majority implies that in order to conclude that there was no manifest necessity to dismiss a jury under a given set of circumstances there must be a Supreme Court case that has previously reached the same conclusion, *see Maj. Op.* 6172-74, it confuses the AEDPA rule, which does not apply in this case, with the applicable rule: whether, in light of the "unique situation[ ]" before the trial court, there was a manifest necessity for the declaration of a mistrial. *Somerville*, 410 U.S. at 462. We have an obligation to answer that question, "according to our best understanding of the individual constitutional rights . . . involved," *Witt v. Dep't of Air Force*, 527 F.3d 806, 823 (9th Cir. 2008) (Canby, J., concurring in part and dissenting in part), rather than to look to whether this precise question has been previously addressed by the Supreme Court.

[3]The majority cites Nev. Rev. Stat. § 200.030(4) as authority for this proposition. That provision simply states the various punishments available in Nevada for first-degree murder and says nothing whatsoever regarding the use of a separate penalty hearing in capital cases.

that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg v. Georgia*, 428 U.S. 153, 189 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.); *see* Mary Sigler, *Contradiction, Coherence, and Guided Discretion in the Supreme Court's Capital Sentencing Jurisprudence*, 40 Am. Crim. L. Rev. 1151, 1152 (2003). That is, as a matter of historical fact, separate penalty proceedings were instituted in capital cases for the explicit purpose of having fact-finders apply objective criteria to death eligibility decisions, ensuring that a punishment "unique in its severity and in its irrevocability" not be arbitrarily applied. *Spaziano v. Florida*, 468 U.S. 447, 459 n.7 (1984).[4] Which form of life imprisonment or lesser sentence is to be imposed on non-death eligible defendants who have been "acquitted" of the death penalty is at most an incidental or ancillary purpose of the proceeding, which could as easily be done by allowing the trial judge to make that decision.[5] The Nevada Supreme Court has affirmed that what is true of capital sentencing schemes generally is true of the Nevada's use of a separate capital sentencing hearing, explaining that the state adopted separate sentencing proceedings in capital cases for the specific purpose of "genuinely narrow[ing] the class of persons *eligible for the death penalty*." *Hollaway v. State*, 6 P.3d 987, 996 (Nev. 2000) (quoting *Arave v. Creech*, 507 U.S. 463, 474 (1993)) (emphasis added).

---

[4]*See also Ring v. Arizona*, 536 U.S. 584, 606 (2002) ("States have constructed elaborate sentencing procedures in death cases, Arizona emphasizes, because of constraints we have said the Eighth Amendment places on capital sentencing.").

[5]Indeed, under Nevada law, where the jury fails to decide upon a sentence in a capital case, a judge may, rather than convene a new jury, simply enter a non-capital sentence of life without parole. Nev. Rev. Stat. § 175.556. That a jury's verdict is not required for a sentence of life without parole in a capital case should remove any doubt that the primary concern of capital sentencing proceedings in Nevada is not, as the majority suggests, simply to allow a jury to arrive at a final sentence, even if it be life with or without parole.

In this case, the trial judge twice denied Harrison the opportunity to learn whether he had been acquitted of the death penalty: first she denied Harrison's motion for a bifurcated penalty proceeding in which a verdict would have been rendered as to his death eligibility prior to any determination as to his ultimate sentence;[6] then she denied Harrison's request that the jury be polled regarding his death eligibility prior to discharging it without any necessity therefor. The majority contends that notwithstanding Harrison's Fifth Amendment right to be free of Double Jeopardy, such decisions are simply to be made in the trial court's discretion, and if, in the exercise of that discretion, the trial judge deprived Harrison of any opportunity to learn whether or not the jury had found him ineligible for the death penalty, then so be it. This view would seem to disregard totally the constitutional rule that the trial judge may not discharge the jury unless there is a manifest necessity for doing so. The majority appears to believe that when the trial judge simply denies every effort a defendant makes to learn whether the jury found him to be ineligible for the death penalty, he should be satisfied to hope that a second jury will find him ineligible for the death penalty, as in this case Harrison's first jury appears to have done. The constitutional right to not be placed twice in jeopardy of the death penalty is apparently now available only to those defendants with the good fortune to be assigned trial judges who are inclined to enforce it.

---

[6]In its prior opinion the majority emphasized that Harrison failed to move for such bifurcation, arguing that Harrison had an opportunity to obtain a separate verdict regarding death eligibility but waived it, and was therefore not entitled to poll the jury on the subject at any future time during the proceedings. Now that Harrison has brought to the court's attention the fact that he did move for bifurcation, the majority simply omits mention of the subject and leaves its underlying analysis of the case entirely unchanged, completely unbothered by the fact that the trial judge consistently denied Harrison the opportunity to learn whether or not the jury had deemed him ineligible for execution and whether the Fifth Amendment thus bars him from being sentenced to death in any future proceedings.

Clearly it cannot be the case that the enforcement of such an important constitutional right hinges entirely on a trial judge's discretionary rulings. Rather, given that separate capital penalty proceedings are held for the express purpose of determining whether the defendant is eligible for capital punishment under objective criteria prescribed by the legislature, *see Hollaway*, 6 P.3d at 996, there is never a manifest necessity to declare a mistrial without first inquiring, pursuant to the defendant's request, whether the jury was, or would be, able to arrive at a unanimous conclusion regarding the defendant's death-eligibility. The majority declares that the trial judge determined "that further deliberations would not help the jury arrive at a verdict," *Maj. Op.* at 6152; that the jury "was deadlocked, and unable to reach a verdict," *Maj. Op.* at 6152; and that the jury "was deadlocked over Harrison's sentence," *Maj. Op.* at 6153. But there is absolutely no basis for believing—nor did the trial judge suggest—that the jury "was deadlocked, and unable to reach a verdict" regarding the central question that the capital sentencing proceeding was intended to address: whether Harrison was "eligible for the death penalty." *Hollaway*, 6 P.3d at 996. Indeed, there is abundant evidence suggesting that the jury was *not* deadlocked on that question, and that it had, in fact, decided Harrison was not eligible for a death sentence. Simply because the jury could not come to a decision whether Harrison should be sentenced to life with or without parole, or even whether to impose some lesser sentence, does not mean that there was a manifest necessity for the trial judge to dismiss the jury without inquiring whether it had decided that Harrison was not death eligible or providing it the opportunity to reach that verdict and inform the court that it had done so.[7] Quite the opposite.

---

[7]The majority states that under Nevada law, "the only jury determination of any significance—and the only one that is sufficiently final to constitute a 'verdict' in the ordinary sense—is the jury's decision regarding which sentence to impose." Maj. Op. at 6166 (emphasis removed). This highly dubious and conclusory assertion, even if it were correct as a matter of state law, would be simply irrelevant to the federal constitutional question whether the Double Jeopardy Clause barred the trial judge from

In holding that a capital sentencing jury may be discharged without even a minimal inquiry as to whether it had arrived at a unanimous conclusion as to the defendant's death eligibility, the majority fails to respect what the Supreme Court declared over a generation ago: that "the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination." *California v. Ramos*, 463 U.S. 992, 998-99 (1983). It also ignores what the Court declared almost 200 years ago when it established the manifest necessity test: "*in capital cases especially*, Courts should be extremely careful how they interfere with any of the chances of life, in favour of the prisoner." *United States v. Perez*, 22 U.S. (9 Wheat.) 579, 580 (1824) (emphasis added). As a result of the trial court's failure to follow long-established law regarding double jeopardy and the death penalty, Harrison could well be put to death notwithstanding the fact that the first jury impaneled in this case may have already concluded, or might shortly have concluded if asked whether it had deadlocked over the issue, that he was ineligible for the punishment of death. To reiterate, Harrison's trial judge dismissed the jury when there was unquestionably no manifest necessity to do so and without ever asking the jury whether it was deadlocked on any question relating to the death penalty. It is difficult to conceive of a more obvious or serious violation of the Double Jeopardy Clause. *See Downum v. United States*, 372 U.S. 734, 736 (1963). I regret that the majority refuses to acknowledge it.

I dissent.

---

declaring a mistrial without first determining whether the jury was deadlocked regarding death eligibility. The same is true with respect to the other arguments made by the majority with respect to state procedure, although it is clear that nothing in Nevada law purports to prevent the trial judge from inquiring as to whether the jury had decided or could decide the question of death eligibility, and accepting a verdict on that issue.