**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| ROYCE C. GOUVEIA, *Petitioner-Appellee*, <br><br> v. <br><br> NOLAN P. ESPINDA, Warden, Director of the Department of Public Safety for the State of Hawaii; CLARE CONNORS, Attorney General of the State of Hawaii, *Respondents-Appellants.* | No. 17-16892 <br><br> D.C. No. 1:17-cv-00021-SOM-KJM <br><br><br> OPINION |

Appeal from the United States District Court
for the District of Hawaii
Susan O. Mollway, District Judge, Presiding

Argued and Submitted October 12, 2018
Honolulu, Hawaii

Filed June 12, 2019

Before: Kim McLane Wardlaw, Marsha S. Berzon,
and Johnnie B. Rawlinson, Circuit Judges.

Opinion by Judge Berzon

# SUMMARY[*]

## Habeas Corpus

The panel affirmed the district court's judgment granting Royce Gouveia's 28 U.S.C. § 2241 habeas corpus petition challenging the trial court's grant of a mistrial in his Hawaii manslaughter case in which, after the jury reached a verdict but before the verdict was announced, jurors expressed concern for their safety because of a scary-looking man in the courtroom.

The panel held that the *Rooker-Feldman* doctrine does not preclude a federal district court from exercising jurisdiction under § 2241. The panel did not need to determine precisely what level of deference is owed to the trial court's determination that there was manifest necessity for a mistrial. The panel held that even under a more deferential standard, the trial court's manifest-necessity determination was erroneous because the trial court failed to provide any meaningful consideration of alternatives to mistrial. The panel concluded that the district court therefore did not err in concluding that retrying Gouveia would violate the Double Jeopardy Clause.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

## COUNSEL

Donn R. Fudo (argued), Deputy Prosecuting Attorney, Honolulu, Hawaii, for Respondents-Appellants.

Peter C. Wolff, Jr. (argued), Federal Public Defender, Honolulu, Hawaii, for Petitioner-Appellee.

## OPINION

BERZON, Circuit Judge:

Jurors in Royce Gouveia's trial saw a menacing-looking man on the prosecution side of the courtroom before they retired to deliberate. The jury proceeded to deliberate and reached a verdict. Before the verdict was announced, however, jurors expressed concern for their safety because of the scary-looking man. All the jurors stated that their verdict was unaffected by the man's presence. Nonetheless, the trial court, at the prosecution's request and against Gouveia's opposition, granted a mistrial. On federal habeas review, the district court held that there was no manifest necessity for the mistrial, so retrying Gouveia would violate his right not to be subjected to double jeopardy. We agree.

## I

Gouveia was tried for manslaughter in Hawaii state court for the death of Albert Meyer. *See* Haw. Rev. Stat. § 707-702(1)(a). The testimony was that Gouveia struck Meyer during an altercation, and Meyer died after hitting his head on the pavement. The presentation of evidence concluded, both sides gave closing arguments, and the jury was sent off to deliberate.

This case turns on two notes the jury sent to the trial court in close succession. The first informed the court that the jury had "reached a verdict." A second, drafted a few minutes after the verdict message, stated: "Concern. This morning on prosecutor's side of courtroom there was a man, shaved head, glaring and whistling at defendant. We have concern for our safety as jurors."

After receiving the messages, the trial court gathered the attorneys and informed them about the notes. Explaining that it was inclined "to take no action on this," the trial court asked the parties what approach they suggested. The prosecution requested that the jurors be questioned, and Gouveia's attorney agreed.

The court then conducted individual voir dire of each juror. Before beginning, the court asked the attorneys whether they "ha[d] any idea what this is based on." The prosecution noted that Meyer's brother had been in the courtroom that morning "with [a] shaved head" and appeared "pretty upset."

The trial court proceeded to question each juror. Although a few testified that the man seemed angry and that they were afraid for their safety, all twelve jurors stated that the menacing-looking man's presence had not affected their votes. The jurors gave conflicting testimony as to when the safety concern about the shaved-headed man first came up in deliberations, some saying at the outset, others toward the end, and others only after the verdict was reached. One juror stated, "Yes," when asked whether the fear of the man "impact[ed] other people's decision," but did not elaborate as to how she knew that or what the impact was. But she, like all the others, said her own decision was unaffected.

After questioning the jury, the trial court asked Gouveia's attorney whether he wanted the court to take any additional steps; the attorney declined. The prosecution, however, moved for a mistrial, arguing that there was manifest necessity for a mistrial because some jurors had expressed safety concerns.[1] According to the prosecution, the fact that Meyer's brother was "associate[d] with the prosecution and the decedent side" might have "lended more credibility to Mr. Gouveia's testimony as he testified." Gouveia's attorney opposed the motion, stressing that all the jurors had stated that their own votes had been unaffected by the incident, and that no jurors had expressed to the court any concern about the individual until it was announced that a verdict had been reached.

After a bit more discussion, the trial court granted the mistrial motion:

> I find it difficult to really believe when I . . . apply my reason and common sense to this that at least some of these jurors have . . . what strikes me as a really serious concern for their personal safety and it came up according to, at least as I count, four or five of them, it . . . was . . . one of the first topics of discussion when they got back in the room and started deliberating the case. Somebody brought it up and they started talking about it. It frankly beggars my reason and common

---

[1] Initially, the prosecution requested a mistrial "in an abundance of caution." The trial court then noted, "If you're going to move for mistrial, you better ask me to find manifest necessity," after which the prosecution rephrased its motion to include a request for a manifest-necessity determination.

sense that it would have no bearing on the deliberations in this case and therefore the verdict.

I'm going to grant the State's motion for mistrial. I'm going to find there's manifest necessity for such based on what I said . . . and everything else that's been put on the record, including my questions to counsel.

The verdict's going to be sealed for future purposes, if any, but obviously we're not going to take the verdict. I'm declaring a mistrial and I'm finding manifest necessity for that, because I don't think there's anything short of a mistrial . . . that can cure it. The verdict's tainted, in my view, based on my findings.

A few weeks later, the trial court issued findings of facts and conclusions of law to further explain its decision. The court reasoned that "[a]lthough there [was] no specific juror misconduct" in this case, it would adopt "the well-established 'harmless beyond a reasonable doubt' standard" for juror-misconduct claims. Relying on that standard, the trial court found that "the jurors' statements that the incident did not affect their decision-making process and/or deliberations [were] not credible," and reiterated its prior conclusion that "the jury was not impartial" and that "there [was] manifest necessity for a mistrial."

Gouveia moved to dismiss the prosecution, contending that there was no manifest necessity for the mistrial. The constitutional double jeopardy protection, Gouveia

maintained, would be violated were he retried. The trial court denied the motion.

When Gouveia appealed the trial court's manifest-necessity finding, the appellate court unsealed the verdict form for purposes of the appeal. The form revealed that the jury had unanimously found Gouveia not guilty. *State v. Gouveia* (*Gouveia I*), No. CAAP-14-0000358, 2015 WL 2066780, at *7 (Haw. Ct. App. Apr. 30, 2015). The state appellate court affirmed, with one judge dissenting. *Id.* at *11; *see also id.* at *11–13 (Nakamura, C.J., dissenting). The Hawaii Supreme Court granted discretionary review, but then affirmed over one justice's dissent. *State v. Gouveia* (*Gouveia II*), 384 P.3d 846, 852–53 (Haw. 2016); *see also id.* at 857 (Nakayama, J., dissenting). The state high court held that the trial court "did not abuse its discretion in deciding that manifest necessity existed for a mistrial because the presumption of prejudice could not be overcome beyond a reasonable doubt and no reasonable alternatives to a mistrial were available." *Id.* at 853 (majority opinion).

Gouveia then filed a federal habeas petition. He argued that there was no manifest necessity for a mistrial and that the jury's verdict form, now unsealed, precluded Hawaii from retrying him. The district court granted the petition. *Gouveia v. Espinda* (*Gouveia III*), No. 17-00021 SOM/KJM, 2017 WL 3687309, at *1 (D. Haw. Aug. 25, 2017). It concluded, first, that jurisdiction under 28 U.S.C. § 2254 was not appropriate, as "Gouveia is not currently 'in custody pursuant to the judgment of a State court,'" but that it did have jurisdiction under § 2241. *Id.* at *5 (quoting 28 U.S.C. § 2254(d)). The district court then rejected the state's contentions that the *Rooker-Feldman* doctrine or *Younger* abstention precluded the court from exercising jurisdiction over Gouveia's habeas petition. *Id.* at *6–7.

On the merits, the district court determined that the now-unsealed verdict form was not an acquittal for purposes of double jeopardy. *Id.* at \*10–12. The court first recited several reasons why the trial court's conclusion that the jurors were affected was questionable. *Id.* at \*14. Ultimately, the district court held that, accepting the trial court's jury taint conclusion, Gouveia was entitled to habeas relief. *Id.* at \*15. Alternative remedies for any valid concerns as existed were available, the district court reasoned, so there was no manifest necessity for a mistrial and retrying Gouveia would violate the Double Jeopardy Clause. *Id.* at \*15–17.

Hawaii timely appealed, challenging the district court's exercise of jurisdiction as well as its decision on the merits.

## II

We begin with the jurisdictional point: The state argues that, under the *Rooker-Feldman* doctrine, the district court was barred from exercising jurisdiction under 28 U.S.C. § 2241 over Gouveia's habeas petition. We have not directly addressed the precise question whether *Rooker-Feldman* applies to habeas petitions filed under § 2241, although two other circuits have held that it does not. *See Reitnauer v. Tex. Exotic Feline Found., Inc.* (*In re Reitnauer*), 152 F.3d 341, 343 n.8 (5th Cir. 1998); *Garry v. Geils*, 82 F.3d 1362, 1365 n.4 (7th Cir. 1996). Our gap on this point is understandable, as it is rare that we are asked to address an argument so transparently without merit.

The *Rooker-Feldman* doctrine takes its name from a pair of cases—*Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923), and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983)—both "brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced

and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005). The doctrine holds that "a federal district court does not have subject matter jurisdiction to hear a direct appeal from the final judgment of a state court." *Noel v. Hall*, 341 F.3d 1148, 1154 (9th Cir. 2003). "Direct federal appellate review of state court decisions must occur, if at all, in the Supreme Court." *Gruntz v. County of Los Angeles* (*In re Gruntz*), 202 F.3d 1074, 1078 (9th Cir. 2000) (en banc).

*Rooker-Feldman* is not a constitutional directive but rather "a statute-based doctrine, based on the structure and negative inferences of the relevant statutes rather than on any direct command of those statutes." *Noel*, 341 F.3d at 1154–55. In particular, the doctrine is an interpretation of two statutes: 28 U.S.C. § 1331, which establishes district courts' original jurisdiction, and 28 U.S.C. § 1257, which vests jurisdiction to review most state court decisions solely in the U.S. Supreme Court. *See Gruntz*, 202 F.3d at 1078. "The *Rooker-Feldman* doctrine merely recognizes that 28 U.S.C. § 1331 is a grant of original jurisdiction, and does not authorize district courts to exercise appellate jurisdiction over state-court judgments, which Congress has reserved to [the Supreme] Court." *Verizon Md. Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 644 n.3 (2002).

Because the *Rooker-Feldman* principle is purely statutory, "Congress, if so minded, may explicitly empower district courts to oversee certain state-court judgments." *Exxon Mobil*, 544 U.S. at 292 n.8. Put differently, Congress may, via statute, provide federal district courts with jurisdiction to review state court decisions as long as that jurisdiction is conferred *in addition to* the original jurisdiction established under § 1331. And Congress "has done so, most notably, in authorizing federal habeas review

of state prisoners' petitions." *Id.* We have accordingly recognized that "[i]t is well-settled that the *Rooker-Feldman* doctrine does not touch the writ of habeas corpus," as the writ is "a procedure with roots in statutory jurisdiction parallel to—and in no way precluded by—the [*Rooker-Feldman*] doctrine." *Gruntz*, 202 F.3d at 1079.

*Gruntz* considered whether habeas review under 28 U.S.C. § 2254, covering "writ[s] of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court," 28 U.S.C. § 2254(a), is limited by *Rooker-Feldman*. Gouveia is not currently in custody under a state court judgment, *see Gouveia III*, 2017 WL 3687309, at *5–6, so the district court considered the habeas petition under 28 U.S.C. § 2241, not under § 2254. But the principles underlying *Gruntz* still apply. Applying those principles, *Rooker-Feldman* does not preclude a federal district court from exercising jurisdiction under 28 U.S.C. § 2241, if that statute, like § 2254, confers jurisdiction in addition to the original jurisdiction already conferred by 28 U.S.C. § 1331. It does.

Section 2241 provides that "[w]rits of habeas corpus may be granted by . . . the district courts . . . within their respective jurisdictions" for prisoners "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(a), (c)(3). Relying on this grant of jurisdiction, this court has consistently held that § 2241 confers jurisdiction for "habeas petition[s] raising a double jeopardy challenge to a petitioner's pending retrial in state court." *Wilson v. Belleque*, 554 F.3d 816, 821 (9th Cir. 2009).

The first case so to hold was *Stow v. Murashige*, 389 F.3d 880 (9th Cir. 2004). Like the case at hand, *Stow* concerned a petitioner whose double jeopardy claim had been rejected by

the state supreme court. *Id.* at 885. The petitioner then filed a federal habeas petition under § 2254, arguing that the state supreme court's conclusion was incorrect. *Id.* The district court granted the petition. *Id. Stow* affirmed the district court's grant of habeas corpus but, before doing so, explained that the petitioner's petition, "which raised a double jeopardy challenge to his pending retrial," was "properly treated under § 2241," not § 2254. *Id.* at 885–87.

We have repeatedly reaffirmed *Stow*'s holding.[2] *Stow* and its progeny make clear that, as in the § 2254 habeas context considered in *Gruntz*, jurisdiction in the § 2241 habeas context derives from the federal habeas statutes, not from § 1331. The upshot is that § 2241, like § 2254, provides "a procedure with roots in statutory jurisdiction parallel to— and in no way precluded by—the [*Rooker-Feldman*] doctrine." *Gruntz*, 202 F.3d at 1079.

In light of *Gruntz*, Hawaii acknowledges, as it must, that *Rooker-Feldman* is inapplicable to federal habeas claims filed under § 2254. But the state argues that unlike § 2254, § 2241 does not confer jurisdiction to review state court decisions. Why? Because § 2241 lacks the word "judgment." *Cf.* 28 U.S.C. § 2254(a) ("[A] district court shall entertain an

---

[2] *See, e.g.*, *Dominguez v. Kernan*, 906 F.3d 1127, 1135 n.10 (9th Cir. 2018) ("A pretrial double jeopardy challenge . . . 'is properly brought under § 2241.'" (quoting *Stow*, 389 F.3d at 886)); *Harrison v. Gillespie*, 640 F.3d 888, 896 (9th Cir. 2011) (en banc) ("Our precedent makes clear that 28 U.S.C. § 2241 is the proper vehicle for asserting a double jeopardy claim prior to (or during the pendency of) a successive trial."); *Wilson*, 554 F.3d at 821 ("[A] habeas petition raising a double jeopardy challenge to a petitioner's pending retrial in state court is properly treated as a petition filed pursuant to 28 U.S.C. § 2241."); *Hoyle v. Ada County*, 501 F.3d 1053, 1058 (9th Cir. 2007) ("28 U.S.C. § 2241 . . . empowers district courts to provide habeas relief on pretrial double jeopardy challenges . . . .").

application for a writ of habeas corpus in behalf of a person in custody pursuant to the *judgment* of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." (emphasis added)). This argument has no merit, for two reasons.

First, the state's argument confuses the relationship between the two habeas corpus statutes. Section 2254 "is not itself a grant of habeas authority, let alone a discrete and independent source of post-conviction relief." *Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) (quoting *Medberry v. Crosby*, 351 F.3d 1049, 1060 (11th Cir. 2003)).[3] "Instead, it is § 2241 that provides generally for the granting of writs of habeas corpus by federal courts, implementing 'the general grant of habeas authority provided by the Constitution.'" *Id.* (quoting *White v. Lambert*, 370 F.3d 1002, 1006 (9th Cir. 2004)). Overlaying that general grant of jurisdiction, § 2254 "implements and limits the authority granted in § 2241 for 'a person in custody pursuant to the judgment of a State court." *Id.* (quoting 28 U.S.C. § 2254(a)). Thus, just as habeas review under § 2254 is "a

---

[3] This conception of § 2254 accords with the history of the habeas corpus statutes. Section 2241 codified the general grant of habeas corpus jurisdiction conferred by Congress in 1867. *See* Richard H. Fallon, Jr. et al., *Hart and Wechsler's The Federal Courts and the Federal System* 1197 (7th ed. 2015); *see also Medberry*, 351 F.3d at 1055. Section 2254 was added in its original form in 1948 to add requirements "dealing specifically with challenges to custody resulting from conviction in state court." Fallon et al., *supra*, at 1197. The present § 2254, placing further constraints on federal habeas review of state court convictions, was added as part of the Antiterrorism and Effective Death Penalty Act of 1996. *Id.* at 1197–98; *see also Williams v. Taylor*, 529 U.S. 362, 402 (2000).

procedure with roots in statutory jurisdiction parallel to—and in no way precluded by—the [*Rooker-Feldman*] doctrine," *Gruntz*, 202 F.3d at 1079, so review under § 2241 too is necessarily unaffected by *Rooker-Feldman*.

Second, and relatedly, the state's argument badly misunderstands the relationship between the writ of habeas corpus and state court judgments. A habeas court does not review a state court *judgment*.[4] Rather, "[h]abeas lies to enforce the right of personal liberty; when that right is denied and a person confined, the federal court has the power to release him. Indeed, it has no other power; it cannot revise the state court judgment; it can act only on the body of the petitioner." *Fay v. Noia*, 372 U.S. 391, 430–31 (1963), *overruled in part on other grounds by Wainwright v. Sykes*, 433 U.S. 72 (1977). "'[T]he essence of habeas corpus is an attack by a person in custody upon the legality of that custody,' not necessarily a challenge to a judgment." *Dominguez*, 906 F.3d at 1137 (alteration in original) (citation omitted) (quoting *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973)). For that reason, the writ does not empower a habeas court to modify a state court judgment. *See Lujan v. Garcia*, 734 F.3d 917, 935 (9th Cir. 2013); *Douglas v. Jacquez*, 626 F.3d 501, 504 (9th Cir. 2010).

To be sure, under § 2254, a habeas court does "*oversee* certain state-court judgments," *Exxon Mobil*, 544 U.S. at 292 n.8 (emphasis added), by assessing, in the context of custody pursuant to a judgment, whether those judgments "resulted

---

[4] Some of our cases have been less than precise about this point, describing § 2254 as "provid[ing] expressly for federal collateral review of final state court judgments." *Gruntz*, 202 F.3d at 1079; *see also, e.g.*, *Allen v. Ornoski*, 435 F.3d 946, 960 (9th Cir. 2006); *Lambert v. Blodgett*, 393 F.3d 943, 978 (9th Cir. 2004).

in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or were "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d). For that reason, "§ 2254 requires a nexus between 'the judgment of a State court' and the 'custody' the petitioner contends is 'in violation of the Constitution or laws or treaties of the United States.'" *Dominguez*, 906 F.3d at 1136 (quoting 28 U.S.C. § 2254(a)). But even with that requirement, § 2254 petitions need not "present a challenge to the underlying state court judgment," as long as "the custody complained of is attributable in some way to the underlying state court judgment." *Id.* at 1137. A § 2254 petition may challenge, for example, the loss of good-time credits, *see Preiser*, 411 U.S. at 487, or the revocation of parole, *see Spencer v. Kemna*, 523 U.S. 1, 7 (1998), even though those claims do not challenge the underlying state court judgment.

In sum, the additional jurisdictional grant provided by § 2241—separate and apart from the jurisdiction conferred under § 1331—means that *Rooker-Feldman* is not pertinent. Accordingly, the district court correctly held the *Rooker-Feldman* doctrine inapplicable here.

### III

We turn to the merits of the double jeopardy question.

The Double Jeopardy Clause provides that "[n]o person shall . . . be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. The Clause embodies the principle that "the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense." *Green v.*

*United States*, 355 U.S. 184, 187 (1957). And "[b]ecause jeopardy attaches before the judgment becomes final, the constitutional protection also embraces the defendant's 'valued right to have his trial completed by a particular tribunal.'" *Arizona v. Washington*, 434 U.S. 497, 503 (1978) (quoting *Wade v. Hunter*, 336 U.S. 684, 689 (1949)).

But that principle "does not mean that every time a defendant is put to trial before a competent tribunal he is entitled to go free if the trial fails to end in a final judgment." *Wade*, 336 U.S. at 688. "[A] mechanical rule prohibiting retrial whenever circumstances compel the discharge of a jury without the defendant's consent," the Supreme Court has explained, "would be too high a price to pay for the added assurance of personal security and freedom from governmental harassment which such a mechanical rule would provide." *Washington*, 434 U.S. at 505 n.16 (quoting *United States v. Jorn*, 400 U.S. 470, 479–80 (1971) (plurality opinion)). Rather, "a defendant's valued right to have his trial completed by a particular tribunal must in some instances be subordinated to the public's interest in fair trials designed to end in just judgments." *Wade*, 336 U.S. at 689.

Recognizing these competing interests, Justice Story wrote in a seminal double jeopardy case in 1824 that retrial may be permitted after a mistrial only where a trial court determines that, "taking all the circumstances into consideration, there is a manifest necessity for [a mistrial], or the ends of public justice would otherwise be defeated." *United States v. Perez*, 22 U.S. (9 Wheat.) 579, 580 (1824). *Perez* concerned the circumstances in which a deadlocked jury could support a trial court's determination that there was such "manifest necessity." *Id.* at 579–80. Since then, the same term—"manifest necessity"—has been used in "a wide variety of cases," beyond the deadlocked jury situation, to

encapsulate the circumstances in which "any mistrial declared over the objection of the defendant" is permissible without triggering the double jeopardy protection. *Washington*, 434 U.S. at 505–06.

Under the manifest-necessity standard, "a trial can be discontinued when particular circumstances manifest a necessity for so doing, and when failure to discontinue would defeat the ends of justice." *Wade*, 336 U.S. at 690. For purposes of assessing whether that standard is met, "the key word 'necessity' cannot be interpreted literally; instead, . . . there are degrees of necessity and we require a 'high degree' before concluding that a mistrial is appropriate." *Washington*, 434 U.S. at 506. To establish a manifest necessity, "the prosecutor must shoulder the burden of justifying the mistrial," and "[h]is burden is a heavy one." *Id.* at 505. That heavy burden has not been met here, as we shall explain.

## A

Because our review proceeds under § 2241, the deference owed to a state court under § 2254(d) is not applicable. *See Harrison*, 640 F.3d at 897. Instead, we apply the same standard of review as applied on direct appeal. *See id.*

"A judicial determination of manifest necessity is reviewed for abuse of discretion, but the level of deference varies according to the circumstances in each case." *United States v. Chapman*, 524 F.3d 1073, 1082 (9th Cir. 2008); *see also Washington*, 434 U.S. at 507–09. "At one extreme are cases in which a prosecutor requests a mistrial in order to buttress weaknesses in his evidence," for which "the strictest scrutiny is appropriate." *Washington*, 434 U.S. at 507–08. "At the other extreme is the mistrial premised upon the trial

judge's belief that the jury is unable to reach a verdict." *Id.* at 509. Similarly, "[a] trial judge properly exercises his discretion to declare a mistrial if an impartial verdict cannot be reached, or if a verdict of conviction could be reached but would have to be reversed on appeal due to an obvious procedural error in the trial." *Illinois v. Somerville*, 410 U.S. 458, 464 (1973). In those situations, "[t]he trial judge's decision to declare a mistrial . . . is . . . accorded great deference by a reviewing court." *Washington*, 434 U.S. at 510. "Nevertheless, because the mistrial decision affects a constitutionally protected right, 'reviewing courts have an obligation to satisfy themselves that . . . the trial judge exercised "sound discretion" in declaring a mistrial.'" *United States v. Sanders*, 591 F.2d 1293, 1297 (9th Cir. 1979) (quoting *Washington*, 434 U.S. at 514).

Here, it is highly debatable how much deference is owed to the trial court's determination that there was manifest necessity for a mistrial. To begin, there was no deadlocked jury—the jury said it had reached a unanimous verdict. *Cf. Perez*, 22 U.S. (9 Wheat.) at 580.

Nor does this appear to be a case in which, had the jury verdict favored the prosecution and a judgment in accord with the verdict been entered, the verdict would have been reversible on appeal on account of potential juror bias. *Cf. Somerville*, 410 U.S. at 464. Although one juror suggested that other jurors may have been affected by the presence of Meyer's brother, each individual juror testified that that his presence did not affect his or her own decision. There is no indication that Meyer's brother spoke with, or threatened, any juror in or out of the courtroom. The jury's note pointed only to his "shaved head" and the fact that he was "glaring and whistling at [Gouveia]" as the basis for their concern. And nothing in the record indicates that the jurors knew his

connection to the trial—that is, that he was Meyer's brother. Nor did the presence of Meyer's brother provide any extrinsic information to the jury. In short, the circumstances here appear to fall short of the cases in which we have reversed a conviction for alleged juror bias or taint.[5]

So we have here none of the paradigmatic situations in which we accord great deference to the trial judge as to the manifest necessity for a mistrial. Still, the Supreme Court has also indicated that a case involving *potential* juror bias "falls in an area where the trial judge's determination is entitled to special respect." *Washington*, 434 U.S. at 510. But the potential for juror bias here—as opposed to the safety concern communicated to the court postverdict—is relatively weak, for the reasons already discussed.[6]

Additionally, the Supreme Court has recognized that the Double Jeopardy Clause "prevents a prosecutor or judge

---

[5] *Compare, e.g.*, *United States v. Vartanian*, 476 F.3d 1095, 1098–99 (9th Cir. 2007) (holding that a district court did not err in dismissing a juror who had spoken to members of the defendant's family, defense counsel, and the defendant), *and United States v. Gonzalez*, 214 F.3d 1109, 1113 (9th Cir. 2000) (concluding that juror bias could be assumed where a juror "disclosed the fact that her ex-husband, the father of her daughter, dealt and used cocaine—the same drug and conduct at issue" in the case), *with United States v. Gonzalez*, 906 F.3d 784, 797 (9th Cir. 2018) (rejecting a juror-bias claim where the juror in question "unequivocally stated that she could evaluate all of the evidence impartially"), *and United States v. Hayat*, 710 F.3d 875, 885–89 (9th Cir. 2013) (affirming a district court's finding that a juror was not impermissibly biased despite "several inappropriate racial and religious comments" made by the juror during deliberations).

[6] It is noteworthy as well that, as *Washington* stressed repeatedly, the potential bias in that case was caused by defense counsel's misconduct. *See, e.g.*, 434 U.S. at 501, 512–13, 516. Here, neither attorney has any responsibility for the behavior that led to the mistrial.

from subjecting a defendant to a second prosecution by discontinuing the trial when it appears that the jury might not convict," *Green*, 355 U.S. at 188, and so protects "the importance to the defendant of being able, once and for all, to conclude his confrontation with society through the verdict of a tribunal he might believe to be favorably disposed to his fate," *Washington*, 434 U.S. at 835 (quoting *Jorn*, 400 U.S. at 486). Closer scrutiny is therefore especially appropriate if the parties believed an acquittal was likely forthcoming. They did.

According to the Hawaii Supreme Court, when the mistrial was declared, it was "apparent from the record that the parties believed the sealed verdict was 'not guilty.'" *Gouveia II*, 384 P.3d at 851 n.2. Immediately before declaring the mistrial, the trial court recognized as much, stating, "Well, it's pretty clear to the court what everybody thinks the verdict is based on your arguments and your motions and lack of such." Gouveia therefore had a significant interest seeing his case proceed to verdict—and the prosecution likewise had reason for pressing for a mistrial even if it had no actual concern about jury bias.

How these interests should be balanced is not entirely clear. Overall, the pertinent factors tend to support considerably less deference to the trial court than in the paradigmatic high-deference situation. But we need not finally determine precisely what level of deference is appropriate. Even under a more deferential standard, the trial court erred in concluding that there was manifest necessity for a mistrial.

**B**

Under a more deferential standard, for the most part "we focus on the procedures employed by the judge in reaching

his determination" and assess whether the trial court "(1) heard the opinions of the parties about the propriety of the mistrial, (2) considered the alternatives to a mistrial and chose[] the alternative least harmful to a defendant's rights, [and/or] (3) acted deliberately instead of abruptly." *Chapman*, 524 F.3d at 1082 (alterations in original) (quoting *United States v. Bates*, 917 F.2d 388, 396 (9th Cir. 1990)).

Here, the trial court's determination that manifest necessity justified a mistrial fails at the second step.[7] "A trial court should consider and correctly evaluate the alternatives to a mistrial" and, "once the court considers the alternatives, it should adopt one if less drastic and less harmful to the defendant's rights than a mistrial." *Bates*, 917 F.2d at 396; *see also* 6 Wayne R. LaFave et al., *Criminal Procedure* § 25.2(d) (4th ed. 2015).[8]

---

[7] We reject Hawaii's contention that Gouveia waived this argument when his attorney agreed with the trial court's assertion that "[t]here's no other remedy short of a mistrial that's going to cure this or allow us to take the verdict." *Cf. Ricketts v. Adamson*, 483 U.S. 1, 8–9 (1987) (holding that a defendant may waive double jeopardy protections). As the district court correctly noted, the Hawaii Supreme Court fully addressed the availability of reasonable alternatives and so necessarily considered the issue not waived under state law. *See Gouveia II*, 384 P.3d at 856–57; *see also Gouveia III*, 2017 WL 3687309, at *14 n.2.

[8] The Supreme Court has suggested that a trial court need not consider alternatives when a jury is deadlocked. *See Blueford v. Arkansas*, 566 U.S. 599, 609 (2012) ("We have never required a trial court, before declaring a mistrial because of a hung jury, to consider any particular means of breaking the impasse . . . ."); *see also Renico v. Lett*, 559 U.S. 766, 775 (2010). But these statements apply only to deadlocked juries, and "in cases where the mistrial is based upon something other than jury deadlock, lower courts have continued to examine alternatives

Consideration of potential alternatives was especially important in this case, as the trial court's substantive conclusion that manifest necessity existed for a mistrial was weak. This is not a case in which the indicia of juror bias were so compelling as to cast significant doubt on the fairness of the verdict. Instead, the trial court concluded that a mistrial was needed because it could not "find beyond a reasonable doubt that there was no impact on the deliberations or verdict . . . such that the verdict was not tainted"; the Hawaii appellate courts likewise endorsed the application of this reasonable doubt standard. *See Gouveia II*, 384 P.3d at 854; *Gouveia I*, 2015 WL 2066780, at \*6, 10–11. The use of the reasonable doubt standard in this context is questionable.[9] But even if use of the standard were permissible, the trial court's strong reliance on the standard suggests that its belief that "the verdict was . . . tainted" was not particularly strong. Indeed, immediately before declaring a mistrial, the trial court itself recognized that it

---

to mistrial as part of the manifest necessity analysis." 6 LaFave, *supra*, § 25.2(d).

[9] Gouveia does not challenge the Hawaii courts' use of the reasonable doubt standard, so do not determine its propriety. We note, however, that the application of that standard appears inconsistent with the Supreme Court's admonition that "the prosecutor must shoulder the burden of justifying the mistrial if he is to avoid the double jeopardy bar." *Washington*, 434 U.S. at 505. The Hawaii Supreme Court appears to have imported the reasonable doubt standard from the harmless error standard applicable where a defendant claims a denial of due process or jury trial rights because of juror or prosecutorial misconduct. *See Gouveia II*, 384 P.3d at 854. But that standard is applied to protect a defendant's constitutional rights: "[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24 (1967). Here, it was the prosecution, not the defendant, that sought a mistrial.

was "a really, really close ruling" on whether a mistrial was necessary.

Further, the record does not indicate that the jurors knew of the scary man's connection to the trial. At most, some jurors surmised from the man's location on the prosecution side of the courtroom and his actions that he was angry at Gouveia. But the leap from any such surmise to *antiprosecution* bias because of those actions is farfetched. If anything, one would think that if the jurors thought the unknown man was dangerous and might hurt them if they sided with Gouveia, they would be biased against Gouveia, so as to avoid the danger an acquittal might create. That obviously did not occur, as we know both from the jurors' attestations that they were not affected and from the unanimous vote to acquit.

Similarly, the trial court's agreement with the prosecution that the jurors' deliberations were likely affected by the scary man's presence was wholly unsupported by any objective fact in the record. All twelve jurors testified that that the presence of Meyer's brother did *not* affect their own decisions. The trial court based its determination on a finding that all twelve jurors' testimony was not "credible." But as the district court noted, "nothing in the record identifies facts supporting [the] finding that the jurors were not believable." *Gouveia III*, 2017 WL 3687309, at \*14. In particular, the trial court "ma[de] no reference to any juror's demeanor." *Id.* "The jurors' ability to serve impartially for the remainder of the trial is at the heart of the [trial] judge's determination of manifest necessity." *United States v. Bonas*, 344 F.3d 945, 949 (9th Cir. 2003). If the reasons for that determination are not reflected in the record, "we have no way of reviewing whether the district judge's decision to declare a mistrial was a sound exercise of discretion." *Id.*

Given all these circumstances, particularly careful consideration of potential alternatives to a mistrial was appropriate. We must ensure that the trial court "exercise[d] a sound discretion . . . with the greatest caution, under urgent circumstances, and for very plain and obvious causes," as Justice Story admonished long ago. *Perez*, 22 U.S. (9 Wheat.) at 580.

The trial court here did not meet this standard. Instead, with regard to consideration of an alternative to subjecting Gouveia to an entire second trial even though the jury had reached a verdict (and one probably in his favor), the trial court simply asserted, "There's no other remedy short of a mistrial that's going to cure this or allow us to take the verdict, correct? It's not like we can continue the trial . . . or I can give them a further instruction." The trial court's conclusion that it could not ask the jury to deliberate further after cautionary instructions appeared to be based on its belief that the jury "reached a verdict already," which could not be changed or reconsidered. The Hawaii appellate courts agreed with this assumption, concluding that there were no reasonable alternatives to a mistrial. *See Gouveia II*, 384 P.3d at 856–57; *Gouveia I*, 2015 WL 2066780, at *10.

If, in fact, the verdict *were* final, as the Hawaii courts suggested, it would constitute an acquittal for purposes of the double jeopardy protection, and a new trial would violate the Double Jeopardy Clause for that reason. "Perhaps the most fundamental rule in the history of double jeopardy jurisprudence has been that '[a] verdict of acquittal . . . could not be reviewed, on error or otherwise, without putting [a defendant] twice in jeopardy, and thereby violating the Constitution.'" *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 571 (1977) (alterations in original) (quoting *Ball v. United States*, 163 U.S. 662, 671 (1896)). Unlike a

mistrial, after which retrial may be permitted with "manifest necessity," an acquittal categorically precludes retrial. *See Brazzel v. Washington*, 491 F.3d 976, 981–82 (9th Cir. 2007).

But here, as the district court correctly recognized, the undisclosed verdict form did *not* constitute a final verdict for purposes of the Double Jeopardy Clause. *Gouveia III*, 2017 WL 3687309, at \*16. Contrary to Gouveia's contentions, with regard to the double jeopardy protection, "in a jury trial, an 'acquittal' . . . occurs only when the jury renders a verdict as to all or some of the charges against a defendant." *Harrison*, 640 F.3d at 898.[10] A "verdict," in turn, "must be rendered by the jury in open court and accepted by the court in order to become final." *Id.* at 899.[11] This reasoning is in accord with the Supreme Court's holding that a preliminary report on the jurors' votes "lack[s] the finality necessary to amount to an acquittal" if it is "possible for [the] jury to revisit . . . its earlier votes." *Blueford*, 566 U.S. at 608.

---

[10] An acquittal may also take the form of a "ruling that the prosecution's proof is insufficient to establish criminal liability for an offense," including "'a ruling by the court that the evidence is insufficient to convict,' a 'factual finding [that] necessarily establish[es] the criminal defendant's lack of criminal culpability,' and any other 'rulin[g] which relate[s] to the ultimate question of guilt or innocence.'" *Evans v. Michigan*, 568 U.S. 313, 318 (2013) (alterations in original) (quoting *United States v. Scott*, 437 U.S. 82, 91, 98 & n.11 (1978)).

[11] Applying these principles, *Harrison* held that the Double Jeopardy Clause did not provide a habeas petitioner with the right "to poll the deadlocked jury on the status of its deliberations in his . . . capital-sentencing proceeding," as there was no "procedural mechanism in which the jury's preliminary determinations [could] be embodied in a valid final verdict." 640 F.3d at 900–01.

It is precisely because the undisclosed verdict form in Gouveia's case was *not* a final verdict of acquittal that the Double Jeopardy Clause's most stringent protections against retrial after an acquittal do not apply. It cannot both be true that the verdict was final and could not be altered *and* that there was nothing that could be done to avoid a mistrial by allowing the jury to revisit the nonfinal verdict.

As the verdict was not final, a variety of alternatives were available to the trial court. The district court recognized one possible route the trial court could have taken:

> [T]he trial judge could have done a brief investigation into the glaring man and could then have called the jury back into court and assured the jury that his inquiries caused him to conclude that the jurors' security was being properly addressed or that there was no safety threat. . . . The trial judge could then have sent the jurors back into the deliberation room to continue their deliberations armed with these assurances. He could have told the jurors that they could reach the same result and even use the same verdict form if, upon further deliberation, they came to the same conclusion, while also providing a blank verdict form for them to use in case they changed their decision.

*Gouveia III*, 2017 WL 3687309, at \*16. Apart from an unexplained, conclusory statement—"It's not like we can continue the trial . . . or I can give them a further instruction"—the trial court provided no discussion of this or any other potential alternative to a mistrial. As the district court put it: "The admonition that all reasonable alternatives

be considered requires more than an assertion. Finding a manifest necessity is a hugely consequential matter that requires a more searching process." *Id.* at \*15.

Moreover, the trial court's error was compounded by its failure to consider the especially prejudicial effect a mistrial would have on Gouveia. "[I]n the final analysis, the judge must always temper the decision whether or not to abort the trial by considering the importance to the defendant of being able, once and for all, to conclude his confrontation with society through the verdict of a tribunal he might believe to be favorably disposed to his fate." *Jorn*, 400 U.S. at 486. Thus, "once the court considers the alternatives, it should adopt one if less drastic and less harmful to the defendant's rights than a mistrial." *Bates*, 917 F.2d at 396.

Retrying Gouveia would expose him to the exact evils against which the Double Jeopardy Clause protects—that is, "the personal strain, public embarrassment, and expense of a criminal trial more than once for the same offense." *Abney v. United States*, 431 U.S. 651, 661 (1977). But the circumstances of Gouveia's mistrial were particularly prejudicial. Here, both sides had already presented their evidence completely. So, in a retrial, the prosecution would be fully aware the weaknesses in its own case as well as the strength of Gouveia's defenses. The mistrial effectively "operated as a post-jeopardy continuance to allow the prosecution an opportunity to strengthen its case." *Somerville*, 410 U.S. at 469. The trial court gave no apparent weight to Gouveia's interests in this regard.

## C

We are, as the district court was, "sympathetic to the dilemma facing Gouveia's trial judge at the time the mistrial was declared." *Gouveia III*, 2017 WL 3687309, at \*16. "[A]

criminal trial is, even in the best of circumstances, a complicated affair to manage." *Washington*, 434 U.S. at 505 n.16 (quoting *Jorn*, 400 U.S. at 479). Faced with jurors who expressed "a really serious concern for their personal safety," the trial court suspected that the presence of the menacing-looking man could have affected the jury's deliberations and the ultimate verdict reached.

But the Double Jeopardy Clause demands more than mere suspicion. "[T]he . . . doctrine of manifest necessity stands as a command to trial judges not to foreclose the defendant's option until a scrupulous exercise of judicial discretion leads to the conclusion that the ends of public justice would not be served by a continuation of the proceedings." *United States v. Dinitz*, 424 U.S. 600, 607 (1976) (quoting *Jorn*, 400 U.S. at 485). By failing to provide any meaningful consideration to alternatives to a mistrial, the trial court disobeyed that command.

We conclude there was no manifest necessity for a mistrial. The district court therefore did not err in concluding that retrying Gouveia would violate his double jeopardy rights and granting the writ.

## IV

The *Rooker-Feldman* doctrine is inapplicable to § 2241 petitions. And retrying Gouveia would violate the Double Jeopardy Clause. We affirm the district court's grant of Gouveia's § 2241 petition.

**AFFIRMED.**